ALEXANDER & ALEXANDER, INC.,
Appellant in No. 81–1933,

v.

Jack ROSE, Phillip S. Seltzer and Nathan R. Seltzer, Individually and trading as Northern Associates, a partnership,

v.

ADMIRAL INSURANCE COMPANY,
defendant on counterclaim,

v.

DELAWARE VALLEY UNDERWRIT-ING AGENCY, INC. deft. on pltf's complaint.

ALEXANDER & ALEXANDER, INC.,

v.

Jack ROSE, Phillip S. Seltzer and Nathan R. Seltzer, Individually and trading as

Northern Associates, a partnership, Appellants in No. 81–1934,

v.

ADMIRAL INSURANCE COMPANY,
defendant on counterclaim,

v.

DELAWARE VALLEY UNDERWRIT-ING AGENCY, INC. deft. on pltf's complaint.

ALEXANDER & ALEXANDER, INC.,

v.

Jack ROSE, Phillip S. Seltzer and Nathan R. Seltzer, Individually and trading as Northern Associates, a partnership,

v.

ADMIRAL INSURANCE COMPANY,
defendant on counterclaim,
Appellant in No. 81–1935,

v.

DELAWARE VALLEY UNDERWRIT-ING AGENCY, INC. deft. on pltf's complaint.

Nos. 81–1933 to 81–1935.

United States Court of Appeals,
Third Circuit.

Argued Jan. 18, 1982.

Decided Feb. 26, 1982.

---

A. Richard Bailey (argued), Cozen, Begier & O'Connor, Philadelphia, Pa., for Alexander & Alexander, Inc., appellant in No. 81–1933 and cross-appellee in Nos. 81–1934 and 81–1935.

Andrew C. Hecker, Jr., William H. Black, Jr. (argued), Hecker, Maginnis, Rainer & Brown, Philadelphia, Pa., for Jack Rose, Phillip S. Seltzer and Nathan R. Seltzer, appellees in Nos. 81–1933 and 81–1935 and cross-appellants in No. 81–1934.

Charles W. Craven (argued), Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for Admiral Ins. Co., appellee in Nos. 81–1933 and 81–1934 and cross-appellant in No. 81–1935.

Richard A. Kraemer (argued), Margolis, Edelstein & Scherlis, Philadelphia, Pa., for Delaware Valley Underwriting Agency, Inc., appellee in Nos. 81–1933 to 81–1935.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question· for decision in this Pennsylvania diversity case involving an extremely complicated insurance transaction is whether Admiral Insurance Company is liable to its insured, Northern Associates. We also must decide whether the district court erred in holding Admiral jointly liable with Alexander & Alexander, the retail insurance broker who represented Northern. Admiral and Alexander & Alexander have appealed, and Northern has cross appealed seeking restitution of its premiums in lieu of the district court's award of damages measured by the benefit of its bargain. We hold that the district court erred in holding the broker jointly liable with the insurer and modify the judgment accordingly, and in all other respects we affirm.

I. ·

Northern Associates is a partnership doing business as a stevedoring contractor. The present controversy concerns an insurance policy issued to Northern by appellant Admiral on March 6, 1975. Appellant Alexander & Alexander (A&A) and appellee Delaware Valley Underwriting Agency (DVUA) are a retail broker and a wholesale broker, respectively, who served as intermediaries between Northern and Admiral.

Northern has obtained workmen's compensation coverage from a number of insurers over the past twenty-five years, but each of its policies has operated on a "retrospective premium" basis. A retrospective premium policy, unlike a standard insurance policy, provides for retrospective determination of the insured's premium obligations according to a formula based on the cost of claims actually paid by the insurer under the policy. A standard workmen's compensation policy requires payment of a fixed premium, which may be calculated in part with reference to the insured's past losses; under a retrospective premium policy, the premium varies according to current, rather than historical, experience. The retrospective policy establishes minimum and maximum premiums to be paid, and it states the standard premium that would be charged under an equivalent standard policy. The minimum is computed as a fraction of the standard premium.

Prior to November 1974, each of Northern's retrospective premium policies included a "loss limitation" provision. A loss limitation provision modifies retrospective premium coverage by limiting the amount of claims paid by the insurer that may be used in computing the retrospective premium. A loss limitation provision fixes a maximum amount either "per claim" or "per occurrence" to be considered in the premium calculation. A "per claim" limitation establishes a maximum amount that may be considered from each individual claim for compensation; a "per occurrence" limitation in effect treats all losses arising from a single accident or occurrence as a single claim. Thus if the maximum figures are the same, an insured receives substantially greater protection from a "per occurrence" than from a "per claim" limitation.[1] The insured pays an "excess loss premium" which, simply stated, insures against its liability for retrospective premiums generated

by payments by the insurer above the stated limitation.

In 1973, A&A negotiated for Northern a one-year retrospective premium workmen's compensation policy with Midland Insurance Company with a loss limitation of $30,000 per occurrence. Northern thereafter asked A&A to explore the options available for workmen's compensation insurance for the following year. Among the options considered were several retrospective premium programs with various loss limitation levels and a self-insurance program (requiring state approval) with insurance coverage for risks in excess of a stated amount.

In October 1974, A&A account manager Edwin Hoffman approached Robert Cohen, a marketing person[2] at DVUA, seeking rate quotations for excess workmen's compensation coverage above various levels of maximum self-insurance. Cohen in turn contacted representatives of several insurance companies, including Morton Calpin, vice president of Admiral's underwriting manager. Calpin quoted Cohen a premium rate of $67,000 to cover Northern for losses exceeding $50,000.

A&A also discussed with Midland the possibility of renewing Northern's policy at various loss limitation levels. In October 1974, Midland quoted an excess loss premium of $66,000 for a $50,000 limitation. On November 4, however, the Pennsylvania Insurance Department announced a new schedule of minimum rates for loss limitation coverage to be effective after October 1974. The minimum annual premium for a $50,000 loss limitation was fixed at $406,021, and Midland accordingly communicated the revised figure to A&A.

Unable to qualify as a self-insurer, Northern through A&A first negotiated a brief extension of the Midland policy that was scheduled to expire November 7, 1974, and thereafter obtained a new retrospective

---

1. The facts of this case illustrate the effect of the distinction between a "per claim" and a "per occurrence" limitation. The final judgment of the district court fixed the benefit to Northern of a $50,000 "per claim" limitation at $9,495, while the additional value of a $50,000

limitation "per occurrence" was found to be $62,601.

2. Cohen testified that a "marketing person" is neither an underwriter nor a salesman but "[s]omeone who markets risks for brokers."

premium policy from Midland providing coverage for the following year. Because of the dramatic increase in Midland's excess loss premiums, however, Northern elected to take out a Midland policy without a loss limitation provision, and it asked A&A to obtain loss limitation coverage from another carrier.

Because Admiral had previously quoted a $67,000 premium to insure losses exceeding $50,000 if Northern qualified as a self-insurer, A&A asked DVUA to determine whether Admiral would issue loss limitation coverage at the same rate. After some telephone discussions between Calpin of Admiral and Vice President James Bryson of DVUA, DVUA's Cohen on December 12, 1974, sent the following telex to Calpin:

> Firm order 12/11/74. Issue annual policy $50,000 loss limitation per your telexed quote 10/18/74. 50 percent of premium due at inception and other half due at time of qualification. Please confirm bound and advise policy number. Would like to bill today. Advise.

Calpin responded by telex the same day as follows:

> Congratulations on order. Good work. Will assign 4 CW 0003 to excess WC policy but all not as easy as that. Understand from Jim Bryson that Midland writing a retro D from inception to qualification and we asked to protect insured's interest in event loss exceeding $50,000 throws retro premium over standard. This wholly different kettle of fish and want DVUA provide proposed wording which [if] O.K. would issue under CM policy series. Will issue CW only when qualified.

Cohen thereafter telephoned Hoffman of A&A, "recapped" Calpin's telex to him and asked him to draft the proposed wording that Calpin had requested.

DVUA issued to A&A a binder on Admiral on December 16. Paragraph (4) of the binder provided, "Amount (or Limits): $50,000 excess loss limitation penalty." Paragraph (7) stated, "Against Perils of: Workmen's Compensation; Excess Standard retro premium." The following statement, which was underlined, appeared near the bottom of the one-page binder: "Not responsible for inaccuracies about which the assured does not notify us immediately." When Hoffman of A&A received the binder he "immediately thought there was a mistake made, since there was never any discussion about excess standard retro premium;" and that the wording was "not correct." He did not notify DVUA that the wording of the binder was in error, however, nor did he send a copy of the binder to Northern. On December 20, he wrote Northern stating that "we have bound with Admiral Insurance Company coverage effective December 11, 1974 which will indemnify/reimburse you for the retrospective premium charge if any under Midland's Workmen's Compensation Policy for losses in excess of $50,000."

On December 30, Hoffman of A&A wrote DVUA suggesting the following policy language: "To pay on behalf of the insured that portion of the retrospective premium cost charged by Midland Insurance Company for claims under Workmen's Compensation and Employers Liability Insurance involving losses exceeding $50,000." DVUA in turn proposed the identical language in a letter to Admiral dated January 3, 1975, but without advising Admiral that it was merely relaying a proposal from A&A. When Calpin of Admiral received this letter, on or about January 6, he entered the following handwritten notation in the margin: "No! That would mean we could be pulled in even if Insured got a retro return. This wasn't what we told Bob Cohen on the phone. Also see our telex of 12/12/74." Calpin did not contact DVUA to discuss the discrepancy or to request a new proposal, however. He testified at trial that he did not act because, "before [he] had a chance to do anything," he received (on or about January 9) a copy of a renewal binder issued by DVUA which was identical to the binder issued December 16. He explained that this document "allayed [his] fears because it was quite apparent that everything was back on track again," notwithstanding the language proposed by Cohen on January 3.

Thereafter, on March 6, 1975, Admiral issued its policy, which contained the following operative language: "this insurance . . . shall indemnify the Insured for the amount of retrospective penalty premium which the Insured is required to pay to Midland Insurance Company caused soley [sic] by any claim paid by Midland Insurance Company in excess of $50,000 each claim." Calpin drafted this language without requesting further advice or assistance from DVUA or referring to any forms or specimens. Admiral did not direct DVUA's attention to the revised language or point out the distinction between the DVUA proposal and the language of the policy, nor did the Admiral policy define "retrospective penalty premium."

Admiral sent the policy to DVUA; and DVUA, apparently without reviewing it, transmitted the policy to A&A. A&A's Hoffman reviewed the policy in detail and discussed it with "others in the office," and he concluded that although the policy was not "word for word as I requested it from DVUA . . . the wording was sufficiently clear to provide what we had requested DVUA to obtain, and what we had quoted to our client, [Northern]." Hoffman then forwarded the policy to Northern, without mentioning the discrepancy to Northern, DVUA, or Admiral.

In August 1977, Northern submitted through A&A a claim against Admiral for reimbursement for the amount of retrospective premiums attributable to losses above $50,000 per occurrence that it had paid to Midland. Admiral denied the claim, taking the position that it was obligated under its policy only to reimburse Northern for premiums in excess of the standard amount.

## II.

These facts are concededly complex and replete with the jargon of the insurance industry, but the history of the proceedings in the district court is equally complicated. A&A originally brought this action against Northern to recover brokerage charges and premium payments it had advanced to various insurance companies on Northern's behalf. Northern counterclaimed against A&A and joined Admiral as a defendant on the counterclaim, alleging breaches of duty arising out of the procurement of the Admiral policy and alternatively claiming that Admiral had breached its obligations under the policy. A&A and Admiral filed cross-claims against each other, and each filed a third-party claim against DVUA asking for contribution or indemnity.

The matter was tried partially non-jury before Judge Cahn and partially before a panel of eight jurors. While the jury was deliberating on the claims involving DVUA, the court announced a bench opinion in which it found Admiral and A&A jointly liable to Northern for loss limitation coverage on a "per occurrence" basis. The jury thereafter found in favor of Admiral but against A&A on their claims against DVUA, and the court entered judgment in accordance with its findings of facts and conclusions of law and the verdict of the jury.

A&A filed post-trial motions to set aside the judgment and the court's findings of fact and conclusions of law, to set aside the jury verdict, and to grant a new trial. Admiral filed a motion to amend and supplement the court's findings, conclusions of law, and judgment, and alternatively for a new trial. DVUA moved for judgment n.o.v. in its favor on Admiral's third-party claim. Following the submission of briefs and oral argument, the district court filed a memorandum opinion granting DVUA's motion for judgment n.o.v. and amending its previous bench opinion and order to limit Admiral's liability to "per claim" coverage. On April 23, 1981, the court entered judgment in accordance with its findings of facts and conclusions of law and its post-trial memorandum. A&A then appealed and Admiral and Northern filed cross appeals.

## III.

Apparently the only matter not seriously controverted was that Northern owed A&A $53,116.24 for brokerage fees and premium advances, plus interest in the amount of $8,346.23. It is the series of counter-

claims and cross claims that give rise to this appeal. Northern was awarded $9,495.00 plus interest in the amount of $2,025.95 against A&A and Admiral jointly, reflecting the benefit to Northern of a policy providing a retrospective premium loss limitation of $50,000 per claim. Inasmuch as A&A alone was found responsible for the failure to procure "per occurrence" coverage, it was held solely liable for the difference between a loss limitation of $50,000 per claim and $50,000 per occurrence, or $62,601.00 plus interest in the amount of $11,134.11. Judgment was entered in favor of DVUA against A&A on A&A's claim for contribution, in accordance with the jury verdict; and judgment n.o.v. was entered against Admiral on its claim for contribution against DVUA.

On appeal, Admiral challenges the determination that it is liable to Northern for the benefits of "per claim" coverage, and it argues alternatively that the district court erred in granting judgment n.o.v. to DVUA on Admiral's claim for contribution. A&A argues that the court erred in holding it jointly liable with Admiral and alternatively that it should be granted a new trial on its claim against DVUA. A&A does not now challenge the determination that it bears sole liability for the difference between "per occurrence" and "per claim" coverage, $62,601 plus interest, so we need not address that issue. Northern argues that the district court erred in measuring damages by the benefit of its bargain instead of awarding restitution of its premiums. All parties agree that the case is governed by Pennsylvania law.

IV.

The district court based Admiral's liability to Northern on two theories: (1) that Admiral was aware of a possible misunderstanding at the time the insurance was placed and nevertheless included in the policy an ambiguous endorsement that did not resolve the misunderstanding; and (2) that

Admiral did not exhibit the type of good faith and due care which Pennsylvania law requires of insurers who do business in the Commonwealth. Admiral contends that the finding that it acted in bad faith is clearly erroneous, and that the policy should be construed according to "the objective, industry-wide definition" of the "term of art" that it employed. We think the findings are fully supported by the evidence, and we hold that under the circumstances each of the alternative theories employed by the court below is a proper basis for holding Admiral liable under the policy.

When Admiral asked DVUA to propose wording for the endorsement, DVUA sent this request to A&A. A&A then provided a draft of the wording which DVUA forwarded to Admiral. Admiral rejected this proposal and made a notation on the letter from DVUA, identifying the precise problem which arose in this law suit, but it made no attempt to resolve this discrepancy by contacting either DVUA or Northern. Admiral then redrafted the endorsement, but it did not include a definition of its terms.

The district court determined, and we agree, that the language employed by Admiral was ambiguous in that it did not clearly limit its coverage to the retrospective premium in excess of the standard premium.[3] Moreover, as Judge Cahn pointed out in his bench opinion, the language of Admiral's December 17, 1974, telex to DVUA—"to protect insured's interest in event loss exceeding $50,000.00 throws retro premium over standard"—demonstrates that Admiral knew how to word an endorsement to eliminate any misunderstanding. The district court found also that Admiral's Calpin "used his superior competence to take advantage of the technical distinction between excess loss limitation coverage and retrospective penalty insurance when he knew that the policyholder did not realize the impact of the distinction," mem. op. at 7, and that finding is not

---

**3.** *See generally Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980).

clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir. 1972).

Under the circumstances, where the insurer has recognized a possible coverage problem and issued a policy containing an ambiguous provision designed to deny the coverage sought by the insured, we believe that Pennsylvania law will not permit the insurer to rely on the restrictive endorsement to deny liability under the policy. A long and unbroken line of Pennsylvania precedents holds that ambiguous language in a contract of insurance must be construed strictly against the insurer who is responsible for the language chosen in order to give the insured the benefit of the indemnity for which he has bargained, and this rule has been applied to transactions involving sophisticated commercial contractors as well as to consumer transactions resembling contracts of adhesion. *See, e.g., Manufacturers Casualty Insurance Co. v. Goodville Mutual Casualty Co.*, 403 Pa. 603, 607, 170 A.2d 571, 573 (1961); *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Insurance Co.*, 385 Pa. 394, 400, 123 A.2d 413, 416 (1956). This rule surely applies *a fortiori* when the insurer, having notice of the expectations of its prospective insured,[4] has issued a policy containing ambiguous language designed to "take advantage of the technical distinction" between two types of coverage, knowing "that the policyholder did not realize the impact of the distinction." *Cf. Hionis v. Northern Mutual Insurance Co.*, 230 Pa.Super. 511, 517–18, 327 A.2d 363, 366 (1974) (where insured relied on companies' agents to obtain desired coverage and companies offered no proof that insured was aware of and understood policy exclusions, policies must be construed in favor of the insured).

Admiral relies on *Broker's Title Co. v. St. Paul Fire & Marine Insurance Co.*, 610 F.2d 1174 (3d Cir. 1979), another diversity case decided under Pennsylvania law, where we held:

A person of legal age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not in his best interest he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument that he signed. *Id.* [*Schoble v. Schoble*, 349 Pa. 408] at 412, 37 A.2d [604,] 605 [1944]. *See also First National Bank & Trust Co. v. Shaffer*, 338 Pa. 244, 248, 12 A.2d 916, 917 (1940). As Judge Cercone of the Pennsylvania Superior Court has stated:

> The important concept in interpretation of any contract is the objective manifestation of assent. Restatement, 2d § 2, Comment b (1973). The subjective meaning attached by either party to a form of words is not controlling on the scope of the agreement between the parties unless one party knows or has reason to know of a particular meaning attached by the party manifesting assent. Restatement of Contracts, Second § 226, Comment b. (Rev.Tent.Draft No. 107, 1973).

*Id.* at 1180–81 (quoting *Contractor Industries v. Zerr*, 241 Pa.Super. 92, 105, 359 A.2d 803, 809 (1976) (Cercone, J., dissenting)). *Broker's Title*, however, holds no solace for Admiral. The disputed provision in that case was unambiguous, and the clear predicate for the teaching of that decision was that "the other party to the contract had no notice of the misunderstanding." *Id.* at 1176. Here, the endorsement was ambiguous, and the record and the findings of the district court clearly demonstrate that Admiral had notice of the misunderstanding. Because the controlling circumstances of *Broker's Title* are not present, its rule does not apply to the present case.

The district court further determined that Admiral had engaged in "sharp prac-

---

4. Admiral does not appear to argue that the district court's finding that it had notice of the misunderstanding is clearly erroneous. We think there would be no grounds for such an argument in any event, given Calpin's notation on the DVUA letter and his testimony at trial that he understood the proposed language and understood it as being "different from [his] previous discussion" with DVUA.

tice," and it held that "the primary basis for liability against the insurer is its lack of good faith." We agree that Admiral's attempt to take advantage of a technical distinction whose significance was unknown to the insured was accurately described as "sharp practice." In fact, this coverage was the subject of a good bit of jesting in the Admiral office. Judge Cahn specifically found:

> 22. On October 15, 1976, an Admiral inter-office memorandum stated:
>
> "This comes up for renewal 11/7/76. I'm not too keen on it but before I send them a 'Dear John' telex, I'd like your opinion since it is apparently close to your heart."
>
> 23. On October 18, 1976, the reply to said inter-office memo stated:
>
> "I really doubt that the insured will want to renew it because they have finally caught on to what it was they really bought. Go ahead and decline renewal if you want."

Bench op. at 13. Sharp practice has no place in the insurance market. *See Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 594–95, 388 A.2d 1346, 1353–54 (1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). We will not disturb the district court's determination that Admiral's lack of good faith constitutes an independent ground for holding it liable to Northern.

### V.

■ We cannot accept, however, the district court's decision to hold A&A, the broker, and Admiral, the insurer, jointly liable for the benefit of "per claim" loss limitation coverage. Although Pennsylvania courts have not spoken on the question, other jurisdictions have recognized the logical inconsistency of holding a broker liable for failure to obtain coverage that the insurer is held to have provided. *See, e.g., United States Fidelity & Guaranty Co. v. McKinnon,* 356 So.2d 600 (Ala.1978); *Tri-Delta*

*Engineering, Inc. v. Insurance Co. of North America,* 80 Cal.App.3d 752, 146 Cal.Rptr. 14 (1978); *Crawford v. DiMicco,* 216 So.2d 769 (Fla.App.1968); *Corrigan v. Kentucky Insurance Agency, Inc.,* 122 Ill.App.2d 80, 257 N.E.2d 274 (1970). The district court recognized the force of this body of precedent, but determined that it was inapplicable because inasmuch as "the main basis for imposing liability on Admiral is lack of good faith," it was "not really holding the insurer responsible on the policy." Mem. op. at 8. In this the court erred.

Admiral could not be held liable to Northern outside of the contractual relationship, good or bad faith in the negotiations notwithstanding. The true basis for holding Admiral liable—even recognizing the district court's assignment of primacy to its determination of bad faith—was reformation of the contract by means of a declaratory judgment giving effect to the reasonable expectations of the parties as manifested in their negotiations. This rested on the "theory that the parties came to an understanding, but in reducing it to writing, . . . through mistake of one side and fraud [or bad faith] on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon. . . ." *Harley v. Magnolia Petroleum Co.,* 378 Ill. 19, 28–29, 37 N.E.2d 760, 765 (1941). "The utility of a declaratory judgment is manifest. It has been allowed in many cases involving insurance policies." E. Re, Remedies 287 (1982).[5] Next, since the insurance contract as reformed is deemed to reflect the original intention of the parties, the insured had the right to demand from the insurer the amounts to which it was entitled under the policy. Northern thus was entitled to receive from Admiral the benefit of a $50,000 per claim loss limitation protection. Admiral having denied a proper claim for those amounts, Northern was entitled to a judgment in this action. Judge Cahn found that the benefit to Northern of this protection was

---

5. *Cf. Travelers Ins. Co. v. Bailey,* 124 Vt. 114, 118, 197 A.2d 813, 816 (1964) ("Where, as here, an antecedent contract has been established by

the requisite measure of proof, equity will act to bring the erroneous writing into conformity with the true agreement.")

$9,495.00, and we will not disturb that determination on appeal.

Although there is ample basis in the record for finding that A&A was negligent, A&A cannot be held liable for failure to obtain a policy that, as reformed, provides (to the extent of "per claim" coverage) the coverage sought by its client, Northern. We recognize that Judge Cahn sought to do equity in apportioning liability between two culpable defendants, and equity is of course an appropriate consideration when the issues are reformation of contract and breach of fiduciary duty. We believe, however, that Pennsylvania courts would find it more equitable to assign exclusive liability to a party who acted with actual notice and in bad faith than to assign a share to one who was merely negligent—*i.e.*, who failed to satisfy the reasonable standards expected of his profession.

Northern was awarded $9,495.00, plus $2,025.95 interest, against A&A and Admiral jointly. The judgment must be modified to hold Admiral alone liable to Northern for these amounts, which represent the value to Northern of coverage computed on the basis of $50,000 per claim.

## VI.

The remaining arguments have little merit. We reject, for the reasons stated in the opinion of the court below,[6] Admiral's contention that the district court erred in granting DVUA's motion for judgment n.o.v. on Admiral's claim for contribution. A&A's motion for a new trial on its claim against DVUA was properly denied for the same reason; the jury's verdict was entirely justified by the evidence. We also reject Northern's contention that the district court employed an erroneous theory of damages. Recission and restitution may be an appropriate remedy in some circumstances, but in this case, involving an insured risk that has fully materialized and has resulted in a smaller loss than the amount of the premi-

um, Northern's recovery was properly computed by the benefit of its bargain.

## VII.

The judgment of the district court awarding Northern $62,601.00 plus $11,134.11 interest against A&A, and denying Admiral's and A&A's claims against DVUA, will be affirmed. The judgment awarding Northern $9,495.00 plus $2,025.95 interest against A&A and Admiral jointly will be modified as indicated herein, to impose liability for those amounts against Admiral alone and not against A&A, and as modified it will be affirmed. Northern and Admiral to share costs.

---

**6.** "D.V.U.A. was at most a conduit of information between A. & A. and Admiral. It has done nothing to justify the imposition of liability upon it. There was no proof of bad faith on the part of D.V.U.A. Therefore, as a matter of law Admiral is not entitled to contribution from D.V.U.A." Mem. op. at 10.