960 F.2d 1529
 The COLEMAN COMPANY, INC., Plaintiff-Appellee,
v.
CALIFORNIA UNION INSURANCE COMPANY, a foreign corporation;
Indemnity Insurance Company of North America, a
foreign corporation, Defendants-Appellants,
and
AVRECO, INC., a foreign corporation, Defendant-Third Party Plaintiff,
v.
INSURANCE MANAGEMENT ASSOCIATES, INC., Third Party Defendant.
 No. 91-3006.
 United States Court of Appeals,
Tenth Circuit.
 April 7, 1992.
Rehearing Denied April 30, 1992.
 
 Robert G. Martin II (Alvin D. Herrington with him on the brief) of McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for defendants-appellants.
 Gerald Sawatzky (Darrell L. Warta and Stephen M. Kerwick with him on the brief) of Foulston & Siefkin, Wichita, Kan., for plaintiff-appellee.
 Before ANDERSON, TACHA and BALDOCK, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 At issue in this declaratory judgment action is the interpretation under Kansas law of an umbrella insurance policy[1] issued by defendant-appellants California Union Insurance Company ("Cal Union") and Indemnity Insurance Company of North America ("Indico") to plaintiff-appellee The Coleman Company, Inc. ("Coleman").[2] Specifically, we must determine whether defense costs incurred by the insured, Coleman, which are clearly included in calculating the limit of liability of the underlying policy, are also included in calculating the attachment point of the umbrella policy. On cross-motions for summary judgment, the district court construed the policy as ambiguous, and held that, under Kansas law, the policy must be interpreted against Cal Union. Our jurisdiction arises under 28 U.S.C. § 1291, and our review is de novo. Hocker v. New Hampshire Ins. Co., 922 F.2d 1476, 1480 (10th Cir.1991). While we do not agree with the district court that the umbrella policy is ambiguous, we affirm the district court's order because the terms of the policy unambiguously support Coleman's construction. See Scivally v. Time Ins. Co., 724 F.2d 101, 103 (10th Cir.1983) ("trial court's decision will be affirmed if the record reveals another ground which supports the decision").
 
 
 2
 While the umbrella policy at issue in this case was for the years 1980-85, a discussion of the circumstances leading to an earlier excess policy for the years 1978-79 is helpful in understanding the source of this dispute and the parties' knowledge in entering into the disputed insurance contract. In 1977, third-party-defendant Insurance Management Associates ("IMA"), a retail insurance broker, proposed a liability insurance plan to Coleman, a manufacturer of recreational and household goods. The plan provided that Coleman would retain primary coverage of $2.5 million, to include losses and expenses, after which umbrella liability coverage would attach. IMA contacted defendant and third-party-plaintiff Avreco Inc., a wholesale insurance broker, which, in turn contacted Cal Union about obtaining umbrella coverage for Coleman. Avreco submitted materials it had received from IMA to Cal Union, see Aplee.App. 1-97, including a proposed underlying comprehensive general liability ("CGL") policy which included defense costs in its limits of liability.[3] See id. at 37.
 
 
 3
 Cal Union initially declined to write umbrella coverage for Coleman, but after two subsequent inquiries by Avreco, Cal Union "indicate[d]" that it would write an excess policy "to follow Commercial Union primary which [sic] standard CGL/Products form."[4] Aplts.App. at 375. Avreco responded with a "firm order to bind and issue coverage...." Id. at 376. The following day, Cal Union communicated to Avreco that the excess policy was binding as of January 1, 1978, and that a copy of the underlying policy was required. Aplee.App. at 98. Three months later, the underlying policy, which included defense costs within the policy limits, was sent to Cal Union. See id. at 99-135, 107. Cal Union subsequently drafted an endorsement to the 1978 excess policy stating that an obligation to defend was not within the excess policy's coverage.[5] Cal Union then issued the 1978 excess policy, and an identical policy was issued for 1979.
 
 
 4
 With this background in mind, we address the policy at issue. Beginning in 1980 and continuing through 1985, Cal Union issued an umbrella policy which is different from the 1978-79 excess policy.[6] In interpreting this policy, we must "consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter and the purpose to be accomplished." American Media, Inc. v. Home Indem. Co., 232 Kan. 737, 658 P.2d 1015, 1018 (1983); Mah v. United States Fire Ins. Co., 218 Kan. 583, 545 P.2d 366, 369 (1976); Bramlett v. State Farm Mut. Auto. Ins. Co., 205 Kan. 128, 468 P.2d 157, 159 (1970). The umbrella policy must be "construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense...." American Media, 658 P.2d at 1018; Mah, 545 P.2d at 369; Bramlett, 468 P.2d at 159. "The test to be applied in determining the intention of the parties ... is not what the insurer intended the policy to mean, but what a reasonable person in the position of the insured would understand it to mean."[7] American Media, 658 P.2d at 1019; Fancher v. Carson-Campbell, Inc., 216 Kan. 141, 530 P.2d 1225, 1229 (1975). See also St. Paul Fire & Marine v. Medical Protective Co., 691 F.2d 468, 470 (10th Cir.1982).
 
 
 5
 The "Insuring Agreement" of the umbrella policy provides that Cal Unionwill indemnify [Coleman] for ultimate net loss in excess of the retained limit hereinafter stated which [Coleman] shall become legally obligated to pay as damages because of [p] A. personal injury [p] B. property damage [p] C. advertising injury [p] to which this insurance applies, caused by an occurrence....
 
 
 6
 Aplts. Brief, ex. B. The "Insuring Agreement" also imposes a "duty" on Cal Union to defend
 
 
 7
 [w]ith respect to any personal injury, property damage or advertising injury not within the terms of coverage of underlying insurance but within the terms of coverage of this insurance, or [p] [i]f the limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury....
 
 
 8
 Id. Costs incurred by Cal Union in defending Coleman are "in addition to the amount of ultimate net loss payable...." Id.
 
 
 9
 As Cal Union's duty to indemnify for "ultimate net loss" is triggered when the "retained limit" is exceeded, the critical definition in calculating the attachment point of the umbrella policy is "retained limit." This term is defined in a separate section entitled "Retained Limit--The Company's Limit of Liability." This section provides that Cal Union's "liability is limited ... [to] the ultimate net loss in excess of [Coleman's] retained limit...." Id. "Retained limit" is then defined, in relevant part, as
 
 
 10
 an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by [Coleman].
 
 
 11
 Id. Schedule A, in turn, lists the underlying insurance carrier, the underlying policy by number, and the limit of liability, per occurrence and in the aggregate, on the underlying policy.
 
 
 12
 Coleman continues to maintain that the umbrella policy unambiguously provides that defense costs are included in calculating the attachment point. Coleman argues that the policy's definition of "retained limit" which directs the reader to a specific underlying policy in Schedule A unambiguously incorporates the manner by which the underlying policy's limit of liability is calculated in order to calculate the retained limit of the umbrella policy. Given that the underlying policy clearly includes defense costs in its limit of liability, such costs should also be included in determining the retained limit of the umbrella policy.
 
 
 13
 We agree with the district court that this section "does nothing, explicitly or implicitly, to 'incorporate' the terms of the underlying policy." Coleman Co. v. California Union Ins. Co., No. 87-1700-K, slip op. at 16, 1990 WL 146513 (D.Kan. Sept. 6, 1990). The use of the language "amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof," as opposed to language such as "as provided by" or "as contained in" expresses a "manifest intent and effect of this provision ... simply to allow the insurer and insured to designate the total amount of the limits of liability in a separate schedule." Id. at 16-17. Indeed, Coleman's construction reads out the phrases "amount equal to" and "indicated beside." Because we must construe the policy "from the sense and meaning of the terms used," we cannot read out this language. Therefore, the definition of "retained limit" simply indicates that it is an amount as indicated in Schedule A, and gives us no guidance on how to calculate this amount.
 
 
 14
 Coleman's construction of the umbrella policy, however, is supported by an endorsement which provides that "coverage" under the umbrella policy "shall follow and be subject to the same terms and conditions of the underlying policy...."[8] In Home Ins. Co. v. American Home Products Corp., 902 F.2d 1111 (2d Cir.1990), the court recognized that a similar "following form" agreement subjected the excess insurer to the same " 'terms conditions and exclusions' " of the underlying policy.[9] Id. at 1113. Similarly, in Juntunen v. Sea-Con Services, Inc., 879 F.2d 154, 156 (5th Cir.1989), the court interpreted a similar provision stating that the excess policy "shall follow the terms, conditions, definitions and exclusions of the controlling underlying policy" as permitting the excess insurer to reduce its limit of liability by the amount of attorney fees and defense costs it incurred because the underlying policy excluded attorney fees. Id. at 155-56. In King v. Employers Nat'l Ins. Co., 928 F.2d 1438 (5th Cir.1991), the court relied on a similar provision and looked to the underlying policy in which a company was "additional insured" to determine whether the company was an "other insured" under the excess policy. Id. at 1444-45. These cases clearly support Coleman's contention that the endorsement manifests an intent to consider the underlying policy in determining the coverage under the umbrella policy.
 
 
 15
 Given that the manner by which to calculate the "retained limit" is not set forth in the terms of the umbrella policy purporting to define "retained limit," we believe that a reasonable insured in Coleman's position would interpret the endorsement as providing that the manner by which the "retained limit" is calculated is determined by reference to the limit of liability of the underlying policy. This interpretation is consistent with the purpose of excess insurance, of which umbrella insurance is a type, which is to provide coverage where primary insurance ends. See Steve D. Thompson Trucking Co. v. Twin City Fire Ins., 832 F.2d 309, 310 (5th Cir.1987) (per curiam). See generally Michael M. Marick, Excess Insurance: An Overview of General Principles and Current Issues, 24 Tort & Ins.L.J. 715, 717-19 (1989). Absent an expression of intent not to look to the underlying policy in order to calculate the "retained limit" of the umbrella policy, such incorporation is mandated by the express terms of the endorsement to the umbrella policy.
 
 
 16
 Cal Union directs us to the language from the "Insuring Agreement" section of the policy stating that Cal Union "will indemnify [Coleman] for ultimate net loss in excess of the retained limit hereinafter stated which [Coleman] shall become legally obligated to pay as damages...." Cal Union construes the emphasized phrase as modifying "retained limit" and, therefore, contends that the umbrella coverage did not commence until Coleman paid the "retained limit" as damages. The district court agreed with this construction stating that this provision "makes clear that this 'excess' is the amount over and above the retained limit of those sums Coleman is 'legally obligated to pay as damages,' rather than any sums (including defense costs) which Coleman may expend in connection with such claims."[10] Coleman, No. 87-1700-K, slip op. at 12.
 
 
 17
 We do not agree with Cal Union and the district court's construction. First, this construction ignores the language "hereinafter stated," which immediately follows "retained limit" and which, in our view, directs the reader to the section entitled "Retained Limit--The Company's Limit of Liability." Second, this construction overlooks the phrase "to which this insurance applies" immediately following the list of the type of damages that are covered by the umbrella policy. Accordingly, the term "damages" is specifically defined in the umbrella policy as "only those damages which are payable because of personal injury, property damage or advertising injury to which this insurance applies...." In light of these factors and given that the phrase on which Cal Union's argument hangs is found in the "Insuring Agreement" section of the policy, a more reasonable construction is that the emphasized phrase modifies "ultimate net loss," thereby limiting coverage under the umbrella policy to that which Coleman "shall be legally obligated to pay as damages."[11]
 
 
 18
 Additionally, Cal Union points to the umbrella policy's condition entitled "Maintenance of Underlying Policies." This condition imposes an obligation on Coleman to maintain the underlying policy and limits Cal Union's liability, in the event that the underlying policy is not maintained, to that which it would have incurred had Coleman maintained the underlying policy. Specifically, this condition provides that Coleman
 
 
 19
 shall maintain the underlying policies (and renewals thereof) with limits of liability as stated in Schedule A in full effect during this policy period, except for any reduction or exhaustion of the aggregate limit or limits contained in such policies solely by payment of claims arising out of occurrences which happen during this policy period.
 
 
 20
 Aplts. Brief, ex. B. Cal Union contends that the emphasized language provides that the underlying policy can only be reduced or exhausted by "payment of claims" which it construes as limited to damages paid to third parties. However, this section does not purport to define the attachment point of the umbrella policy; the emphasized language simply modifies an exception to Coleman's duty to maintain the underlying policy. Additionally, neither the umbrella policy nor the underlying policy defines "claims." Under a standard liability policy, which imposes separate duties on the insurer to indemnify and defend and does not include defense costs in the limits of liability, "claims" may be typically understood as damages to third parties. However, under a nonstandard policy in which the duty to defend is not a separate obligation and defense costs are included within the limits of liability as in the underlying policy here, a reasonable insured could understood "claims" to encompass defense costs. Nevertheless, under no stretch of the imagination does Cal Union's reference to an undefined term (modifying an exception to a condition) clearly and explicitly reveal Cal Union's asserted purpose of limiting the definition of "retained limit"--a term to which an entire separate section of the policy is devoted. See Krug v. Millers' Mut. Ins. Ass'n, 209 Kan. 111, 495 P.2d 949, 954 (1972) (insurer assumes a duty to define limitations on coverage in clear and explicit terms); Goforth v. Franklin Life Ins. Co., 202 Kan. 413, 449 P.2d 477, 481 (1969) (insurer must use "clear and unambiguous language" to restrict coverage).
 
 
 21
 Cal Union asserts that had the parties intended to include pre-attachment defense costs in determining retained limit of the umbrella policy, Cal Union would have charged substantially higher premiums or would have increased the attachment point. Cal Union's subjective intention is simply not relevant. See St. Paul Fire, 691 F.2d at 470; Clayton v. Alliance Mut. Cas. Co., 212 Kan. 640, 512 P.2d 507, 512 (1973). Cal Union further attempts to cloud the issue by an erroneous reliance on parole evidence concerning the negotiations leading to the 1978 excess policy. Notwithstanding that the evidence of the parties' intent is not as clear as Cal Union would like us to believe, we will not consider such evidence because we do not view the policy as ambiguous. Furthermore, Kansas has clearly developed rules for interpreting insurance policies; these rules do not include consideration of extrinsic evidence. Nonetheless, Cal Union's arguments are contradicted by its course of performance in 1984, 1985 and 1986, as it repeatedly recognized coverage for Coleman's claims under the 1978 excess policy which applied only if defense costs were included in determining the attachment point.[12]
 
 
 22
 In Harnischfeger Corp. v. Harbor Ins. Co., 927 F.2d 974 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 189, 116 L.Ed.2d 150 (1991), the Seventh Circuit interpreted an excess policy as not including pre-attachment defense costs in determining whether the underlying limits had been reached. Id. at 975-76. The underlying policy in Harnischfeger, like the underlying policy here, included defense costs in the limit of the underlying insurer's obligation.[13] Id. at 975. However, nothing in Harnischfeger indicates that coverage under the excess policy would follow the terms and conditions of the underlying policy. Moreover, the excess policy in Harnischfeger did not purport to define its attachment point but rather merely stated that it " 'shall not attach unless and until [Harnischfeger or its insurer] shall have paid the amount of the underlying limits on account of such occurrence.' " Id. at 974. Thus, the court construed the attachment point as it is typically understood in the insurance business as meaning "sums paid to claimants, and not the insured's out-of-pocket expenses." Id. at 975. Thus, while the Harnischfeger court stated that "[n]o (sane) insurer would give its insured ... an option" of counting anything it put in its underlying policy's limits against the attachment point of the excess policy, the express terms of the umbrella policy before us distinguish this case.
 
 
 23
 While we do not doubt that the standard practice in the insurance business is that pre-attachment defense costs are generally not included in determining the attachment point of an excess policy, we believe that excess insurers and insureds generally look to the underlying policy to determine whether its limit of liability has been exhausted in determining whether the excess policy attaches. See Mead Reinsurance v. Granite State Ins. Co., 873 F.2d 1185, 1188 (9th Cir.1989) (excess insurer's liability determined by reference to underlying policy's definition of "ultimate net loss"). While the source of this dispute appears to be that the underlying policy here is not a standard policy, as it includes defense costs in determining whether its limit of liability has been exhausted, we cannot fall back on the standard expectations of an insurer when the insured's underlying policy specifically states something different. Cal Union had the underlying policy, and indeed requested it before issuing any policy. After receiving it, Cal Union added an endorsement relating to its obligation to defend after the policy had attached. Cal Union could have easily expressed its subjective intent that defense costs were not to be included in determining the attachment point of the policy. Thus, notwithstanding Cal Union's claim that Coleman is receiving a windfall, we cannot ignore the plain language of the policy endorsement. Because the manner by which to calculate the "retained limit" is left otherwise undefined, the endorsement providing that coverage "shall follow and be subject to the same terms and conditions of the underlying policy" manifests the parties' intent to look to the underlying policy to determine whether its limit of liability has been reached and, accordingly, whether the "retained limit" of the umbrella policy has been exceeded. Given that the underlying policy clearly includes defense costs in its limit of liability, defense costs must also be included in determining the attachment point of the umbrella policy.
 
 
 24
 This brings us to Cal Union's final argument, that it is entitled to reformation due to mutual mistake. Kansas recognizes that an insurance policy, like any contract, may be reformed due to mutual mistake. See Stamps v. Consolidated Underwriters, 205 Kan. 187, 468 P.2d 84, 94 (1970); New York Life Ins. Co. v. Dickensheets, 165 Kan. 159, 193 P.2d 649, 654 (1948). A unilateral mistake is not sufficient as "both parties [must have] understood that the real agreement was what [the party seeking reformation] alleges it to be, but had unintentionally prepared and executed one which did not express the true agreement." New York Life, 193 P.2d at 654 (internal quotations omitted). Reformation "can never be employed to make a new contract or to supply terms upon which the minds of the parties never met." Waddle v. Bird, 122 Kan. 716, 253 P. 576, 577 (1927). The party seeking reformation has the burden of proving by clear and convincing evidence that the contract does not set forth the true intent of the parties. Id.
 
 
 25
 The district court did not address this claim; nevertheless, we do not believe that Cal Union has made a sufficient showing to defeat Coleman's motion for summary judgment. Cal Union claims that the initial agreement on the 1978 excess policy between it and Avreco was that defense costs were not to be included in determining the attachment point of the excess policy. Cal Union also asserts that its premiums did not account for defense costs being included in the attachment point. As to the latter point, while it may indicate that Cal Union operated under a mistake about the terms of the policy, it does not raise an issue as to Coleman's intent. Similarly, the circumstances surrounding the initial agreement with Avreco on the 1978 excess policy do not raise a genuine issue of material fact. These circumstances indicate, if anything, that the parties each operated under a different understanding of the underlying policy which the excess policy was to follow. By indicating to Avreco that its excess policy was to follow a "standard" CGL policy, Cal Union believed that the underlying policy would not include defense costs in its limit of liability. Nevertheless, Cal Union had the proposed underlying policy, and specifically identified the underlying insurer when it indicated it would provide excess coverage. Avreco obviously knew that the underlying policy included defense costs in its limit of liability because it supplied the policy to Cal Union as demanded prior to the issuance of the excess policy. These facts do not raise a genuine issue of material fact as to whether Avreco did not intend the umbrella policy to include defense costs in calculating its attachment point. Indeed, it is undisputed that IMA instructed Avreco to obtain "following form" coverage. At best, these facts indicate that Cal Union was unilaterally mistaken in its belief that the underlying policy did not include defense costs in its limit of liability. Cal Union has not presented a genuine issue of material fact concerning Coleman's intent sufficient to permit a reasonable fact finder to return a verdict for Cal Union on the reformation issue. Therefore, Cal Union cannot defeat summary judgment by claiming it is entitled to reformation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Umbrella insurance generally provides two types of coverage. First, it provides standard excess coverage that attaches after a predetermined amount of primary coverage has been exhausted. An excess policy covering the same risks that are covered by the underlying policy is known as a "following form" policy. Second, an umbrella policy may provide broader coverage than the underlying policy in which case the umbrella policy will "drop down" and become primary. An umbrella policy will generally impose a duty to defend on the insurer when it "drops down" or when the limits of the underlying policy have been exhausted. An umbrella policy has been characterized as a "hybrid policy, combining aspects of both a primary policy and a following form excess policy." See generally Michael M. Marick, Excess Insurance: An Overview of General Principles and Current Issues, 24 Tort & Ins.L.J. 715, 717-19 (1989). The issue before us relates solely to the excess component of the umbrella policy
 
 
 [2]
 Six policies, for the years 1980 through 1985, are at issue. The 1980 and 1981 policies were issued by Cal Union. The 1982 policy was issued by Pacific Employers but it was fully reinsured by Cal Union. The 1983, 1984 and 1985 policies were issued by Indico. All of the policies were identical with the exception of the 1985 policy, which increased the attachment point from $2.5 million to $3 million. For the sake of clarity, we refer to the six policies collectively as the umbrella policy, and to Cal Union and Indico collectively as Cal Union
 
 
 [3]
 The proposed underlying CGL policy provided for $1 million in coverage with a $950,000 deductible and an annual premium of $50,000. While this appears to be strange, it appears to be common practice when an insured seeks excess coverage to follow an initial layer of self-insured retention. Under the overall plan, Coleman would retain an additional $1.5 million before attachment of the umbrella policy. Given the size of the deductible and the annual premium, Coleman essentially retained the entire $2.5 million
 
 
 [4]
 Defense costs are not included within the limits of liability on a "standard" CGL policy. See Aplts.App. at 359, 369 (Dep. of J. Rugee, Cal Union underwriter); id. at 382 (Dep. of R. Heorman, IMA representative); id. at 386-87 (Dep. of W. Cohen, IMA representative); id. at 399 (Dep. of R. Kampa, Avreco representative)
 
 
 [5]
 This endorsement to the 1978 excess policy stated that "coverage" provided by the excess policy
 shall follow and be subject to the same terms and conditions of the underlying policy ... except for any obligation to investigate and defend and pay for any costs and expenses incident to any of the same, the amounts of the limits of liability, an "other insurance" provision and any other provision therein which are inconsistent with this policy.
 Aplts.App. at 412. This endorsement is consistent with the printed language of the 1978 excess policy, which states that the excess insurance "shall follow that of the primary insurance" except that Cal Union will not have any obligation to defend. Id. at 410.
 
 
 [6]
 See supra note 1 for a general discussion of the distinction between an excess and an umbrella policy. We note that the underlying (primary) policies of both the 1978-79 excess and 1980-85 umbrella policies were identical and clearly provided that defense costs were included in its limit of liability. The underlying policy specifically equated the "Limit of Liability" with "Ultimate Net Loss," which was defined as
 the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of bodily injury, property damage, personal injury, contractual liability, employee benefit liability, liquor liability or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors lawyers, nurses and investigators and other persons and for litigation settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Insured's or Company providing claim handling services permanent employees.
 Aplts.App. at 183 (emphasis added). See also Aplee.App. at 107.
 
 
 [7]
 This rule of interpreting the language of the policy from the perspective of a reasonable insured and the rule of construing ambiguity against the insurer, see Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 248 Kan. 657, 810 P.2d 283, 286 (Kan.1991), are premised on the "rule of contracts that the drafter must suffer the consequences of not making the terms clear," as the insurer generally prepares the policy. Lightner v. Centennial Life Ins. Co., 242 Kan. 29, 744 P.2d 840, 845 (1987). See also Fancher v. Carson-Campbell, 216 Kan. 141, 530 P.2d 1225, 1229 (1975). Thus, the rule would not be applicable when the policy is a product of joint drafting. See Travelers Idem. Co. v. United States, 543 F.2d 71, 74 (9th Cir.1976); United States Shipping Bd. Merchant Fleet Corp. v. Aetna Cas. & Sur. Co., 98 F.2d 238, 241 (D.C.Cir.1938). Here, however, the umbrella policy at issue was prepared entirely by Cal Union. While IMA is responsible for the language in the underlying policy, this language clearly states that defense costs are included in the underlying policy's limit of liability. See supra note 6. Therefore, in attempting to discern the intention of the parties, we must view the policy from the perspective of a reasonable person in Coleman's position
 It has been suggested that the rules strictly construing insurance policies against insurers are grounded in the recognition that insurance contracts typically are adhesion contracts due to the disparate bargaining power of the parties. See Gowing v. Great Plains Mut. Ins. Co., 207 Kan. 78, 483 P.2d 1072, 1075 (1971); Penalosa Co-Op v. Farmland Mut. Ins., 14 Kan.App.2d 321, 789 P.2d 1196, 1198 (1990). Accordingly, some courts have recognized that the rules are not applicable when the parties are of relatively equal bargaining power. See First State Underwriters Agency v. Travelers Ins. Co., 803 F.2d 1308, 1314 n. 5 (3d Cir.1986); Eastern Assoc. Coal v. Aetna Cas. & Sur. Co., 632 F.2d 1068, 1075 (3d Cir.1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981). Nevertheless, the more recent authority from the Kansas Supreme Court grounds the rules in the contract principle of construing against the drafter. See Farm Bureau Mut. Ins. Co., Inc. v. Winters, 248 Kan. 295, 806 P.2d 993, 996 (1991); Shelter Mut. Ins. Co. v. Williams, 248 Kan. 17, 804 P.2d 1374, 1379 (1991). Thus, we believe that the Kansas Supreme Court would strictly construe an insurance policy against an insurer, even though the insured is a sophisticated party and of relatively equal bargaining power, so long as the insured did not participate in the drafting of the policy. See Fidelity & Dep. Co. of Md. v. Shawnee State Bank, 13 Kan.App.2d 182, 766 P.2d 191, 196 (1988) (construing "unclear language" of banker's blanket bond against insurer). See also Alexander & Alexander, Inc. v. Rose, 671 F.2d 771, 777 (3d Cir.1982) ("rule has been applied to transactions involving sophisticated commercial contractors as well as to consumer transactions resembling contracts of adhesion"). Nonetheless, we recognize that "[t]he purpose of [these] rule[s] ... is not to predetermine disputes but only to assist the court in determining the intent of the parties to the contract." Lightner, 744 P.2d at 845.
 
 
 [8]
 Initially, this endorsement was identical to the endorsement of the 1978-79 excess policy which excepted "any obligation to investigate and defend and pay for any costs and expenses incident to any of the same, the amounts of the limits of liability, an 'other insurance' provision and any other provision therein which [was] inconsistent with this policy" from the provision that coverage under the policy was to follow the terms and conditions of the underlying policy. See Aplts. Brief, ex. B (Endorsement No. 10). See also supra note 5. The district court interpreted the premodification exception to the endorsement as supporting the interpretation that defense costs were not included in determining when the attachment point had been reached. Coleman, No. 87-1700-K, slip op. at 12-13. We do not agree with this construction; the question of whether the umbrella policy obligates the insurer to defend once the umbrella policy has attached is separate and distinct from the question of whether pre-attachment defense costs should be included in determining whether the "retained limit" of the umbrella policy has been reached. Cf. Harnischfeger Corp. v. Harbor Ins. Co., 927 F.2d 974, 975 (7th Cir.1991) (inclusion of defense costs in excess policy's limit of liability did not require inclusion of defense costs in excess policy's underlying limits)
 Arguably, the premodification endorsement's exception of the underlying policy's "limits of liability" and of "any other provision ... inconsistent with [the umbrella] policy" raises some question as to whether the parties intended to look to the underlying policy's limit of liability in determining the "retained limit" of the umbrella policy. However, when a dispute arose in 1984 due to the inconsistency between the insuring agreement's obligation to defend and the endorsement's exception of an obligation to defend, Cal Union modified the endorsement by deleting all of the exceptions. See Aplts.App. at 227. While we recognize that the purpose of this exception was to resolve the inconsistency and provide defense coverage once the umbrella policy had attached, this does not negate the plain language of the modified endorsement that coverage under the umbrella policy "shall follow and be subject to the same terms and conditions of the underlying policy."
 
 
 [9]
 The "following form" agreement in the policy at issue in Home Ins. expressly provided that it was subject to the same warranties, terms and conditions "except as otherwise provided herein." 902 F.2d at 1113. While the court recognized that this clause required that the excess policy would control in the event it conflicted with the underlying policy, it nonetheless stated that "both policies must be looked to in determining the scope" of the excess insurer's liability. Id. (holding that excess insurer was not required to indemnify insured for post judgment interest and defense costs as these items were specifically excluded from excess policy's coverage notwithstanding that they were covered under underlying policy). We note that the "following form" provision at issue here, as modified, contains no similar exception for terms and conditions that are inconsistent with the umbrella policy
 
 
 [10]
 We do not fully understand how the district court could find this construction to be "clear" yet still find the policy to be ambiguous
 
 
 [11]
 This construction is consistent with the umbrella policy's definition of "ultimate net loss." "Ultimate net loss" refers to Cal Union's obligation to indemnify once the umbrella policy attaches and is defined as "the sum actually paid or payable in cash in the settlement or satisfaction of losses for which [Coleman] is liable by adjudication or compromise ... but excludes all loss expenses and legal expenses...." Aplts. Brief, ex. B
 
 
 [12]
 Although the 1978 excess policy is different from the 1980-85 umbrella policy, it contained an identical endorsement providing that it's coverage would follow the terms and conditions of the underlying policy, and the underlying policies for the 1978 excess policy and the 1980-85 umbrella policy both included defense costs within their limits of liability. See supra notes 5 and 6
 
 
 [13]
 The excess policy in Harnischfeger, unlike the umbrella policy here, included defense costs in its limit of liability. 927 F.2d at 925. Recognizing that the function of the limit of liability clause in the excess policy was to say that the insurer will pay no more than a specified amount, the court rejected the insured's argument that because the excess policy included defense costs in its limit of liability, the underlying limit should also include defense costs. Id. The court stated that "nothing in the structure of the [excess] policy or the text of its clauses suggests that it is also designed to trigger [the insurer's] exposure before $3 million in indemnity has been paid." Id. We have rejected a similar argument made by Cal Union. See supra note 8