**FEDERATED RURAL ELECTRIC INSURANCE CORP.,**
Plaintiff,

and

Tig Insurance Company, Plaintiff—Appellant,

v.

**CERTAIN UNDERWRITERS AT LLOYDS, London, and London Market Companies, foreign entities, Defendant,**

and

**Public Utility District No. 1 of Cowlitz County, a Washington municipal corporation, Defendant—Appellee.**

No. 07–35596.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 2008.

Filed Sept. 19, 2008.

Toni Y. Anders, Maria E. Sotirhos, Bullivant Houser Bailey, PC, Seattle, WA, Lloyd Bernstein, Ronald J. Clark, Douglas G. Houser, Bullivant Houser Bailey, PC, Portland, OR, Frank B. Goldberg, Lori R.E. Ploeger, Michael Traynor, Cooley Godward Kronish, LLP, San Francisco, CA, for Plaintiff-Appellant.

Matthew Gonzalez, Jennifer Hoffman, Arjang Victory, Bruckman & Victory, New York, NY, Philip A. Talmadge, Talmadge Law Group, PLLC, Tukwila, WA, Michael E. Ricketts, Gordon Thomas Honeywell Malanca Peterson & Daheim, Seattle, WA, for Defendant-Appellee.

Before: B. FLETCHER and PAEZ, Circuit Judges, and SCHWARZER *, District Judge.

---

* The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

## MEMORANDUM **

Plaintiff–Appellant TIG Insurance Company ("TIG") appeals the district court's judgment in favor of Defendant–Appellee Public Utility District No.1 of Cowlitz County, Washington ("PUD"). The sole question on appeal is whether the district court erred in determining that the TIG following-form excess policy failed to sufficiently specify that its exclusion for "any ... earth movement" was meant to exclude coverage for "sinkhole collapse" in light of a provision extending coverage for such a peril in PUD's primary insurance policy with Federated Rural Electric Insurance Exchange ("Federated").[1] We review de novo the district court's interpretation of the TIG policy, and we affirm.[2]

TIG argues that the district court erred in finding that the TIG policy provided coverage for sinkhole collapse. We disagree. The primary goal in interpreting a contract is to determine the agreement intended by the parties at the time of contract. *Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222, 226 (1990). Nonetheless, under Washington law, "[i]f the language of an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify or create ambiguity where none exists." *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.,* 124 Wash.2d 789, 881 P.2d 1020, 1025 (1994). Where the language of a contract, however, "is fairly susceptible to two different reasonable interpretations" it is considered ambiguous. *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.,* 123 Wash.2d 891, 874 P.2d 142, 145 (1994). "Unresolved ambiguities are resolved against the drafter-insurer and in favor of

the insured." *Queen City Farms v. Cent. Nat'l. Ins. Co.,* 126 Wash.2d 50, 882 P.2d 703, 713 (1994) (citation omitted).

The TIG excess policy, which follows the "terms, conditions, and definitions of coverage and recovery" of the Federated policy "[e]xcept as provided elsewhere in [the TIG excess policy]," specifically excludes coverage for "any ... earth movement." The TIG excess policy itself does not anywhere define "earth movement." Undefined terms in a contract are not necessarily ambiguous and are generally assigned their "plain, ordinary, and popular meaning." *Queen City Farms,* 882 P.2d at 712. *See also Truck Ins. Exch. v. Rohde,* 49 Wash.2d 465, 303 P.2d 659, 664 (1956). Whether the plain meaning of earth movement includes a sinkhole collapse is a difficult question to answer with certainty. The Court need not undertake such an inquiry here, however, as the Federated policy, which the TIG policy follows unless it provides otherwise, may reasonably be read to define the term "earth movement" to exclude sinkhole collapse.

The TIG policy provision in question is contained in Section I.D., as amended by the Miscellaneous Endorsement. The sentence beginning "Any earth movement (other than sinkhole collapse) ..." in Section I.D.(2)(a) may be viewed as defining the term "earth movement" in the immediately preceding heading "2. Losses resulting from earth movement" as excluding sinkhole collapse. Of course, the same language may alternately be reasonably interpreted to define "earth movement" as including sinkhole collapse. In this latter view, the words "other than" preceding "sinkhole collapse" suggest that sinkhole

---

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

1. The parties do not dispute that the cause of the loss was sinkhole collapse.

2. We have jurisdiction pursuant to 28 U.S.C. § 1291.

collapse is a form of earth movement, but that sinkhole collapse is excepted from the earth movement exclusion. In light of these two reasonable interpretations, the Federated policy is ambiguous as to the definition of earth movement. As unresolved ambiguities are to be interpreted in favor of the insured, we must therefore interpret the Federated policy as defining earth movement to exclude sinkhole collapse.

Because the TIG excess policy "follow[s] the terms, conditions, and definitions" of the Federated policy unless it specifies otherwise, we properly import the Federated policy definition of earth movement into the TIG excess policy. Further, even without this following form language, the Federated policy's definition of earth movement is strong extrinsic evidence of the parties' intended meaning for earth movement in the TIG policy because the latter policy was clearly intended to apply "an additional layer of excess coverage" over the Federated policy. *Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1221 (9th Cir.2007) (quoting *Pub. Util. Dist. No. 1 of Klickitat County*, 881 P.2d at 1027) (applying Washington law to find that definition of terms in an underlying policy was extrinsic evidence of the meaning of the same terms in endorsement to umbrella policy); *see also Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1533–34 (10th Cir.1992) (relying on general principles of insurance law to find that umbrella policy expressly following underlying policy may have certain of its terms defined by reference to the underlying policy.)

TIG asserts that we may not read the TIG excess policy in conjunction with the Federated policy. In TIG's view, the excess policy stands alone. In support of this proposition, TIG relies on *Home Ins. Co. v. American Products Corp.*, 902 F.2d 1111 (2d Cir.1990) (per curiam). However, that case states that where there is no conflict between a "following form" policy, such as the TIG policy, and an underlying policy, they must be read together in determining the scope of the excess insurer's liability. *Id.* at 1113; *see also Coleman*, 960 F.2d at 1534 n. 9 ("While the court [in *Home Insurance* ] recognized that ... the excess policy would control in the event it conflicted with the underlying policy, it nonetheless stated that 'both policies must be looked to in determining the scope' of the excess insurer's liability." (quoting *Home Insurance*, 902 F.2d at 1113)).

Unlike in *Home Insurance*, where there was a "conflict" between the two policies because the excess policy explicitly excluded the expenses at issue from coverage while the underlying policy included them, *see* 902 F.2d at 1113–14, here there is no "conflict" or inconsistency. The Federated and TIG policies do not define "earth movement" in an inconsistent manner; rather, the TIG policy is simply less specific than the Federated policy in that it does not state whether "sinkhole collapse" is encompassed in the "earth movement" exclusion. Because there is no "conflict," we look to both the Federated policy and the TIG policy to determine whether the TIG policy, like the Federated policy, covers sinkhole collapse. Doing so, in turn, reveals the ambiguity that requires us to rule in favor of PUD.

TIG also brings to our attention this court's recent decision in *Northrop Grumman Corp. v. Factory Mutual Ins.*, 538 F.3d 1090 (9th Cir.2008). In that case, Northrop Grumman Corporation procured both a primary and excess policy from Factory Mutual Insurance Company. 538 F.3d at 1091–92. At issue was the meaning of the word "flood" in the excess policy. The insured sought to use the differing definition of flood in the primary and

excess policies to create ambiguity with regard to the meaning of flood in the excess policy. This court, applying California law, rejected the insured's argument, asserting that "[t]hough the primary policy may be consulted in interpreting the excess policy, we decline to treat the two documents as one contract." *Id.* at 1095. The court also refused to read into the excess policy's less specific definition of flood, as compared to the primary policy's definition, ambiguity as to whether the insurer thereby intended to narrow the meaning of the word in the excess policy. *Id.* at 1096–98. The court instead proceeded to define flood according to its plain meaning and the definition laid down in the excess policy alone. *Id.* at 1095–98.

The holding in *Northrop* in no way forecloses our analysis here. There is no indication in the court's review of the excess policy at issue in *Northrop* that it was a following form policy like the TIG policy. Furthermore, as noted above, we do not find ambiguity here because of differing definitions of earth movement in the Federated and TIG policies, as was urged in *Northrop* with respect to the definition of flood. We find ambiguity in this case because the TIG policy possesses no definition of earth movement, requiring us by the TIG policy's own terms to reference the Federated policy, which itself is ambiguous in its definition of earth movement.

Accordingly, we hold as a matter of law that the TIG policy provides coverage for sinkhole collapse and affirm the district court's judgment.

**AFFIRMED.**