**CONTINENTAL CASUALTY COMPANY, Plaintiff–Appellee,**

v.

**PITTSBURGH CORNING CORPORATION and PPG Industries, Inc., Defendants–Appellants.**

Nos. 89–2989, 89–3046, 89–3393 and 89–3394.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1990.

Decided Oct. 24, 1990.

As Amended Oct. 24, 1990.

Rehearing and Rehearing En Banc Denied Dec. 17, 1990.

James K. Perrin, Marsha K. Ross, Haskell & Perrin, Chicago, Ill., for plaintiff-appellee.

John M. Cramer, Reed, Smith, Shaw & McLay, Harrisburg, Pa., for Pittsburgh Corning, Inc.

George E. McGrann, M. Richard Dunlap, Dickie, McCamey & Chilcote, Pittsburgh, Pa., John M. Cramer, Reed, Smith, Shaw & McLay, Harrisburg, Pa., Marsha K. Ross, Haskell & Perrin, Bruce Logan, George J. Anos, Ash, Anos, Freedman & Logan, Chicago, Ill., for PPG Industries, Inc.

Before BAUER, Chief Judge, and POSNER and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Years ago Continental Casualty Company issued comprehensive general liability insurance policies to manufacturers of products that contain asbestos. In this lawsuit against these manufacturers Continental sought, and on motion for summary judgment obtained, a declaration that the policies do not make it liable for the costs the manufacturers have incurred in defending themselves against thousands of products liability suits. Since the policies are identical so far as the terms in dispute are concerned, we shall pretend, for the sake of simplicity, that they are a single policy. It is an "excess" policy: the insurer's liability does not kick in until the liability limits in the insured's primary insurance policy have been reached. Although Continental's limits of liability are very large—more than $200 million—the insurance premiums were very low: a few thousand dollars. The reason is twofold. The policy was issued back in the 1960s, before asbestos tort litigation was anticipated; and, as an excess insurer, Continental's exposure is less than that of a primary insurer.

Continental agrees in the policy to "indemnify [the defendants], in accordance with the applicable insuring agreements of the Primary Insurance, against loss subject to the limits stated in Item 6, Section I of the Declarations and as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth in Item 6, Section III of the Declarations." The key word is "loss," which the policy goes on to define as "the sums paid in settlements of losses for which the insured is liable ... and shall exclude all expense and costs." "Costs" in turn are defined as "interest on judgments, investigations, adjustment and legal expenses (excluding, however, all expense for salaried employees and retained counsel of and all office expense of the insured)." If we ignored both the second clause in the indemnity provision ("and as fully ...") and the parenthetical expression in the definition of "costs," the appeal would be frivolous. The indemnification is limited to loss, loss excludes costs, costs include legal expenses, so legal expenses are excluded from coverage.

But the parenthetical, to begin with it, carves out of "legal expenses" the expense of "retained counsel," and most of the defense costs incurred by defendants in products liability suits are the legal fees of the

counsel whom they have "retained" to defend them in those suits. Yet if the term "retained counsel" is read as broadly as this, the exclusion of "legal expenses" from the coverage of the policy will have no force, since there are few legal expenses that cannot be fitted within "all expense for ... retained counsel of ... the insured."

The puzzle is easily solved once the method of creating insurance contracts is understood. Concerned to minimize uncertainty, insurance companies are very reluctant to change terminology whose meaning has been fixed in litigation or approved by the state agencies that regulate insurance. They prefer to create new coverage not by drafting a new contract from scratch but instead in modular fashion: standard terms whose meaning has been tested in litigation or blessed by regulators are shuffled to create the particular package of insurance protection that the customer desires. One of the standard terms is "legal expenses." Often the customer for a liability insurance policy wants his legal expenses to be indemnified, and when he does the insurance company lists "legal expenses" among the covered risks. To avoid complicated questions of cost allocation (such as how to allocate the cost of the insured's in-house general counsel, and of the general counsel's office and secretary, among the general counsel's various projects including the litigation whose costs the insurance company has agreed to cover), the contracts carve out, in the parenthetical clause that we quoted earlier, the expense of in-house counsel and other salaried employees, the associated office expense, and the expense of any lawyers who are on retainer to the firm, as distinct from lawyers hired for a particular case. Consistent with this analysis, *V. Van Dyke Trucking, Inc. v. "The Seven Provinces" Insurance, Ltd.*, 67 Wash.2d 122, 130, 406 P.2d 584, 589 (1965), interpreted the same parenthetical phrase as in Continental's policy to mean that "the Assured cannot claim expenses that it would have routinely incurred for legal counsel in its normal business operation."

*Van Dyke* was a case in which the insured had bought coverage for legal expenses. When as in this case the insurance company wants to *exclude* legal expenses from coverage, it uses the same standard term, parenthetical and all. (God forbid that it should draft new language!) But in thus failing to modify the standard clause the company does not intend to extend coverage to the excluded items in the parenthetical. *Occidental Fire & Casualty Co. v. Underwriters at Lloyd's*, 19 Ill. App.3d 265, 271–72, 311 N.E.2d 330, 335 (1974). *That* exclusion is significant only when the policy insures against legal expense, which the policy here does not.

The other provision on which the defendants hang their hats is the second clause in the policy's first paragraph. This is the clause in which Continental Casualty promises to indemnify them, "in accordance with the applicable insuring agreements of the Primary Insurance, against loss subject to the limits stated in Item 6, Section I of the Declarations *and as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth in Item 6, Section III of the Declarations.*" The defendants treat the clause we have italicized as incorporating all the terms of the primary insurance policies, policies which as it happens insure the defendants against "ultimate net loss," defined to *include* legal expenses. (The use of "net" could of course be thought to distinguish those policies from the present one, even without the definition.) And by a sleight of hand that we do not begin to understand they then argue that Continental Casualty's duty to indemnify such expenses is not cabined by the policy's monetary limits.

The reference to Item 6 has first to be explained. Item 6 sets forth the limits of Continental's liability in three sections. The first lists the limits in Continental's policy. The second lists the limits in the policies of the primary insurers, that is, the insurers whose policy limits must be exhausted before the insured can look to Continental, the excess insurer. The third sums the first two and thus indicates the total coverage of the insured, given Conti-

nental's policy. In light of this understanding of the reference to Item 6, the statement that Continental agrees to indemnify the insured "as though" the primary insurance had been issued up to the limits set forth in Section III can be seen to have three possible functions. One is to make clear (rather unnecessarily, one might think) that Continental's liability does not disappear merely because the insured fails to maintain primary coverage. The only consequence of such a failure is that the insured is responsible for his loss up to the point at which Continental's excess coverage kicks in. Another possible function, but one redundant in light of later language in the policy and also in tension with the words "as fully as," is to protect Continental against "drop-down" liability—that is, liability for losses against which the insured should have but failed to take out primary coverage.

The third possible function of the clause and the one that strikes us as the most plausible is to make Continental liable in certain cases *before* the outer limit of the primary insurance policy has been reached. For there are two separate limits. One is a limit on how much the primary insurer must pay for a single accident; the other and higher limit is on how much the primary insurer must pay for all accidents. Suppose these limits are $5 million and $20 million respectively, and the insured incurs a liability of $8 million for a single accident. The sentence in question may be intended to make clear that Continental is obligated to pick up the tab for the $3 million loss above the primary insurer's limit even though the primary insurer's aggregate limit has not been exceeded. Otherwise the insured would not be fully protected against liability in excess of the limits in his primary insurance policy. We cannot be certain that this is the correct interpretation, but none of the interpretations that we have canvassed or any other plausible interpretation of the clause provides any comfort to the defendants in this case. Cf. *American Motorists Ins. Co. v. Trane*, 544 F.Supp. 669, 699 (W.D.Wis.1982).

The briefs conduct a learned debate over the proper standard for interpreting an insurance contract governed by Pennsylvania law (as, all agree, this one is)—how strictly the contract should be interpreted against the draftsman (Continental), what significance should be attached to the fact that it is a standard-form contract rather than a dickered contract, and so forth. The debate is irrelevant. For the most part the only significance of interpretive principles is as tie-breakers. And some students of interpretation think that they have no significance—that they are figleaves for decisions reached on other grounds. However that may be, the question whether Continental is liable for the defendants' defense costs is not in equipoise. Continental is not liable.

■ But there is one principle of contract interpretation that we have employed implicitly, and it may be useful to bring it out into the open. That is the principle that an exclusion from insurance coverage cannot create coverage. *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 247–48, 405 A.2d 788, 795 (1979); *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 211, 684 P.2d 960, 965 (1984). (The narrower the scope of an interpretive principle, the more likely it is to make good sense and have real bite.) The multiplication of two negative numbers produces a positive one: $-2 \times -2 = 4$. By analogy one might suppose that if a policy excludes legal expenses and legal expenses are defined as excluding office expenses, the policy covers office expenses. The modular construction of insurance contracts shows that the analogy is inapt. The exclusion of office expenses and related expenses from the definition of legal expenses has significance only when the insurance policy covers legal expenses—not when it excludes them. The exclusion within an exclusion is a nullity.

Although in reading contracts as in reading statutes and other texts it is prudent to hesitate before concluding that a passage should be disregarded, either because it is redundant or because in context it makes no sense, *Two Guys From Harrison–N.Y., Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 468–69, 472

N.E.2d 315, 318 (1984), sometimes the conclusion is warranted, or even compelled. *North Gate Corp. v. National Food Stores, Inc.*, 30 Wis.2d 317, 323, 140 N.W.2d 744, 748 (1966). Here, for example. The exclusion of office and related expenses from the exclusion of legal expenses is pure surplusage in a contract that excepts rather than covers legal expenses. It is true that to see this one must know something about how insurance contracts are made. But this is just to say that interpretation, like other legal methodologies, is at bottom a practical art.

AFFIRMED.