**HARNISCHFEGER CORPORATION,**
Plaintiff–Appellant, Cross–Appellee,

v.

**HARBOR INSURANCE COMPANY,**
Defendant–Appellee,
Cross–Appellant.

Nos. 90–2104 and 90–2162.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1991.

Decided March 18, 1991.

Rehearing and Rehearing En Banc Denied
April 29, 1991.

A. Benjamin Goldgar, Robert W. Hallock, Robert A. Creamer, Keck, Mahin & Cate, Chicago, Ill., Andrew O. Riteris, Chris J. Trebatoski, K. Thor Lundgren, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff-appellant, cross-appellee.

Ric J. Gass, Kasdorf, Lewis & Swietlik, Milwaukee, Wis., for defendant-appellee, cross-appellant.

Before FLAUM, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Harbor Insurance Company sold Harnischfeger Corporation excess policies for 1981 and 1982, which "shall not attach unless and until [Harnischfeger or its insurer] shall have paid the amount of the underlying limits on account of such occurrence." Another provision defined the underlying limits as "$1,000,000.00 combined single limit each occurrence[,] $3,000,000.00 com-

bined single limit in the aggregate". Harnischfeger obtained this coverage from "self insured retention". Harnischfeger contracted with Employers Insurance of Wausau for administration of its obligations, and its contract with Wausau limited that firm to $3 million of outlay including legal fees and costs. When Wausau had paid $3 million including legal fees for each of the coverage years, Harnischfeger tendered to Harbor the defense of claims against it. We must decide whether Harbor's policy kicks in when Harnischfeger (through Wausau) is out of pocket $3 million, or only when it has paid $3 million in claims. (Harbor issued policies covering two years: November 1, 1980, to October 31, 1981, and November 1, 1981, to October 31, 1982. We simplify by referring to only one policy and by abbreviating the periods to 1981 and 1982.)

■ Harbor relies on the "loss payable" paragraph of the policy, which we have quoted. It adds that in the insurance business underlying limits are understood to mean sums paid to claimants, and not the insured's out-of-pocket expenses. A policy with a $1 million limit means $1 million of indemnity; an insured would be flabbergasted if its underwriter paid $500,000 on a $1 million policy and then asserted that it had reached the "policy limits" given the costs of defense. Just so, Harbor insists, with limits underlying an excess policy. The excess policy takes up where the primary policy leaves off, and if the primary policy provides (or is supposed to provide) a given amount of indemnity, then the excess insurer's obligation is postponed until that sum has been paid. The district court agreed and awarded summary judgment to Harbor.

Harnischfeger does not deny any of this. It argues instead that Harbor wrote a non-standard policy, yielding a non-standard result. One clause, captioned "limit of liability", says that Harbor "shall only be liable for the Ultimate Net Loss, the excess of ... the limits of the underlying insurances as set out in the attached schedule". Another, captioned "ultimate net loss", defines that term to mean "the total sum which the Insured ... become[s] obligated to pay by reason of personal injuries ... and shall also include ... expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits". Harbor thus agreed to pay $10 million of "ultimate net loss", including legal costs. Because the "limit of liability" clause also refers to "ultimate net loss", Harnischfeger argues that it was invited to define the primary coverage to include legal fees. Moreover, the "limit of liability" clause keys Harbor's exposure to the "limits of underlying insurances"; it obtained insurance from Wausau that measures the firm's exposure by reference to out-of-pocket costs. That definition was incorporated into Harbor's policy, Harnischfeger contends, by the "limit of liability" clause.

This is clever but no more persuasive to us than it was to the district judge. Harnischfeger essentially contends that the "limit of liability" clause gave it a free hand: it could count against the $3 million anything that it put in the agreement with Wausau. No (sane) insurer would give its insured such an option, certainly not in such a backhanded manner. After all, the clause in question is called *"limit* of liability". Its function is to say that Harbor will pay *no more than* a specified amount—the "ultimate net loss", commencing on exhaustion of the primary insurance. Clauses of limitation do not obligate insurers to pay. *Continental Casualty Co. v. Pittsburgh Corning Corp.,* 917 F.2d 297, 300 (7th Cir.1990). Harbor's promise to pay comes in the "loss payable" paragraph, which says that its obligation does not "attach" until Harnischfeger or its primary insurer has "paid the amount of the underlying limits". These are $1 million per occurrence, $3 million total, without any suggestion that the primary limits are the same as "ultimate net loss". The special meaning of "ultimate net loss" was employed to curtail Harbor's total exposure; nothing in the structure of the policy or the text of its clauses suggests that it is also designed to trigger Harbor's exposure before $3 million in indemnity has been paid.

Harbor's policy describes Harnischfeger as a self-insurer, which it was. Wausau played an administrative role; Harnischfeger promised to reimburse it and pay a fee to boot. True, Wausau would have been on the hook had Harnischfeger become unable to repay. But so long as Harnischfeger remained solvent, Wausau was selling not insurance but expertise in valuing and resolving claims. How much of this service Harnischfeger purchased from Wausau does not alter Harbor's obligations as an excess carrier.

■ Harnischfeger insists that no matter what we may think of the subject, Wisconsin has determined that its legal expenses count toward the limits of its primary coverage. *Republic Insurance Co. v. Harnischfeger Corp.*, No. 88–1817 (Wis. App. June 21, 1989) [151 Wis.2d 557, 445 N.W.2d 58 (table)], review denied, 449 N.W.2d 276 (1989), allows Harnischfeger to count legal expenses toward the primary limits of an excess policy it secured from another carrier for 1982–83. Under *Erie*, Harnischfeger maintains, we must reach the same decision concerning Harbor's policy. The district judge thought otherwise, as do we, for two reasons. First, Republic's policy contains language different from Harbor's. The court of appeals interpreted the language of Republic's policy without establishing a general rule. What is more, the opinion is unpublished. Wisconsin has a judicial committee in charge of publication, and the decision is made by judges other than those responsible for the opinion. Sometimes an election not to publish reflects a belief that the opinion is old hat and not worth space in the reporters; sometimes nonpublication stems from a belief that the opinion is questionable on the merits. Such a system implies a ban against reliance on unpublished opinions, Wis.Stat. 809.23(3); *Tamminen v. Aetna Casualty & Surety Co.*, 109 Wis.2d 536, 327 N.W.2d 55 (1982), and we have respected that embargo. *Cole v. Young*, 817 F.2d 412, 420 (7th Cir.1987). A noncase for Wisconsin's own purposes is a non-case in federal courts under *Erie*.

■ All that remains is Harnischfeger's invocation of the principle that ambiguities must be resolved against insurers, a doctrine entrenched in Wisconsin. *Wood v. American Family Mutual Insurance Co.*, 148 Wis.2d 639, 436 N.W.2d 594 (1989). Taken to its limits, this doctrine could obliterate exclusions in insurance policies. For language always leaves *some* ambiguities, whether verbal (intrinsic) or situational (extrinsic). Drafters cannot anticipate all possible interactions of fact and text, and if they could the attempt to cope with them in advance would leave behind a contract more like a federal procurement manual than like a traditional insurance policy. Insureds would not be made better off in the process. The resulting contract would be not only incomprehensible but also more expensive.

It is no surprise, then, that neither Wisconsin nor any other state carries the principle to its limits. There must be genuine (meaning, substantial) uncertainty, not resolvable by other means, and the insured's proposed reading must be reasonable. E.g., *Stanhope v. Brown County*, 90 Wis.2d 823, 280 N.W.2d 711 (1979). Rules of interpretation are tie-breakers, even when the words being interpreted appear in insurance policies. *Continental Casualty*, 917 F.2d at 300; *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357, 366 (7th Cir.1990). Harnischfeger and Harbor have not fought to a draw; no tie requires resolution. Perhaps the interpretive principle could be recast as one requiring the insurer to come forth with information in its possession but unknown to the insured. See Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87 (1989). Wisconsin has not suggested this understanding of its approach, perhaps because it doubts judicial ability to determine how much information is optimal; there is always "more", and the evolution of "warning" (i.e., disclosure) claims in the law of products liability provides ground to doubt that the principle could be confined. Be that as it may, the missing information in this contractual relation concerned the Harnischfeger–Wau-

sau policy, which supplies no basis for construing anything against Harbor.

█ Our conclusion that Harbor is responsible only after Harnischfeger pays out $3 million in claims sets the stage for the second facet of this dispute. Harbor seeks to recover from Harnischfeger sums that it has paid to claimants and legal counsel after assuming the defense prematurely. For simplicity we disregard the 1982 policy year and concentrate on 1981. Harnischfeger wrote Harbor in 1986, contending that it had spent more than $3.6 million on account of claims arising out of transactions during the 1981 policy year. It asked Harbor to reimburse it $623,060 and to assume the defense of open claims. Harbor asked for documentation; Harnischfeger provided a computer printout showing, case by case, how much had been paid to claimants and how much to legal counsel. The computer also totaled the columns, showing $2,392,919 in claims paid and $1,230,141 in litigation expenses. Harbor then assumed control of the cases. It now wants Harnischfeger to reimburse it for the expenses it would have avoided had it waited until the claims paid column reached $3 million.

In the district court the parties debated whether Harbor's acceptance of the defense in 1986—when, we have just held, it did not have to—was a mistake of "fact" or "law". The district court concluded that if Harbor made an error of "law" it is not entitled to recoup its loss, but that if it made an error of "fact" it may do so. After characterizing the blunder as one of "law" the district court sent Harbor away empty-handed.

Most disputes involve questions of both fact and law. Courts apply law to facts, producing judgments. Harbor needed to do the same before accepting or rejecting Harnischfeger's tender. Before deciding whether it was responsible as an excess carrier, Harbor had to examine the contract, Wisconsin's legal rules, and the facts concerning payments to date. Such an activity cannot be sorted neatly into bins marked "fact" and "law". Wisconsin has remarked this problem, *Grand Trunk*

*Western R.R. v. Lahiff,* 218 Wis. 457, 461, 261 N.W. 11, 12–13 (1935), and the American Law Institute doubts the existence of a tenable line. *Restatement of Restitution* 179–81 (1936). Two sections of the *Restatement* illustrate the problem. Section 18 allows restitution following a payment made in the mistaken belief that a contract requires payment, yet § 45 illustration 2 disallows restitution in the same circumstance; the difference between the two is the characterization of the latter mistake as one of law.

You cannot answer a question without knowing the function of the inquiry. Why should Wisconsin try to pick through cases of mistaken payments, allowing insurers to recoup some but not others? Harnischfeger suggests no reason at all; it parrots language in a few ancient cases and suggests that we turn off all higher mental centers. Why? If Harbor cannot recover in situations like this one, then it will resolve all close cases against coverage. If Harnischfeger is right, Harbor should have balked when asked to take over the defense—and insurers will balk in the future, compelling their insureds to pay up front and bring suit to recover. Insureds would not count this a gain; we think it likely that insureds would prefer to have their insurers take over immediately (as Harbor did) and settle accounts later (as Harbor has tried to do). Does Wisconsin want to induce insurers to play coy when their clients ask for assistance?

None of the cases we could find implies an affirmative answer. Although several opinions state that there is a distinction between factual and legal errors, e.g., *Gage v. Allen,* 89 Wis. 98, 61 N.W. 361 (1894); *Conway v. Town of Grand Chute,* 162 Wis. 172, 174, 155 N.W. 953, 954 (1916) (dictum), none discusses the principles that would lead a court to prefer one characterization over another. Later cases are more functional, and these omit any suggestion of a clean line. For example, *Lahiff* allowed an insurer to recover a sum paid to the spouse of a person who both the insurer and the spouse believed had died in an accident, after the court determined that

the deceased was someone else. The court observed that settlements of genuine disputes should not be undone just because one party later discovers an error. Settlements, after all, apportion between the parties the uncertainties involved; their function would be destroyed if after the uncertainties have been resolved one side can point to an "error" and recoup. In *Lahiff*, however, there was a mutual mistake of fact and no attempt to compromise a dispute; the court ordered restitution. Several other Wisconsin cases are in this vein; each tries to promote compromises by preventing second-guessing, while allowing restitution in other cases.

*Amalgamated Ass'n of Street Electric Ry. Employees v. Danielson*, 24 Wis.2d 33, 128 N.W.2d 9 (1964) (Fairchild, J.), discusses a second limit on recoupment: detrimental reliance. An insurer paid twice and tried to recover the second payment. The court allowed it to do this, except to the extent the recipient had changed position (by paying a debt) in reliance on receipt of the money. *Danielson*, citing § 69(1) of the *Restatement*, emphasized that restitution is an equitable remedy and allowed the payor to recover only part of the excess. Difficulties in determining what would have happened, had the erroneous payment not been made, provide additional equitable reasons to limit recoupment.

Harnischfeger and Harbor did not in 1986 compromise any dispute between them. True, Harbor overlooked the significance of the printout when stepping in, but this error does not block restitution. *Lahiff* held that it is not relevant that the insurer would not have made the mistake had it conducted a better investigation. 261 N.W. at 14. See also *Restatement* § 59 ("A person who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to his lack of care."). To treat Harbor's error as an absolute bar would be to compel an insurer to reserve its rights expressly as a condition of recoupment, a position Wisconsin has abandoned. *Shannon v. Shannon*, 150 Wis.2d 434, 442 N.W.2d 25, 32–35 (1989); *Utica Mutual Insurance Co.*

*v. Klein & Son, Inc.*, 157 Wis.2d 552, 460 N.W.2d 763, 768 (App.1990). Any obstacles to restitution in this case are equitable, rather than threshold bars.

When it tendered the defense of the 1981 cases to Harbor, Harnischfeger was about $600,000 short of exhausting the limits of its primary responsibility. Had Harnischfeger waited, it would have incurred costs at least this high. Since taking over the claims, Harbor has paid a great deal more than $600,000 to injured persons, and Harnischfeger does not contend that had it retained responsibility for the cases it could have resolved them all for a total of less than $3 million. It follows that Harnischfeger has received a windfall of at least $607,081. Principles of restitution allow Harbor to recover that amount, and an equivalently computed sum for the 1982 policy year.

■ Legal fees are a more complex subject. Had Harnischfeger waited until its payments to claimants reached $3 million before turning the files over to Harbor, Harnischfeger would have incurred substantial additional legal expenses. The ratio of compensation to legal fees reflected in the printout is approximately two to one, implying that by tendering early Harnischfeger saved itself not only the $607,081 in indemnity but also another $300,000 or so in expenses. Harbor bore these in its stead and asks for recompense. But computation of this sum is not nearly so clean as computation of the indemnity. Had it known that Harbor would deny all responsibility until $3 million has been paid to claimants, Harnischfeger might have settled the largest remaining cases promptly and turned the rest over to Harbor with very small additional legal expenses. Harbor, for its part, insists that the $600,000 gap was very expensive to handle. Several cases, it says, were on the verge of trial when Harnischfeger tendered the defenses in 1986. Had Harnischfeger clung to these cases during trial, it would have incurred fees substantially exceeding $300,000, fees that the premature tender foisted on Harbor. Harnischfeger replies that Harbor could have defended these cases for a lot

less than it actually paid to its lawyers, to which Harbor responds that it retained the same law firms Wausau had engaged to handle the cases, so that their bills are solid evidence of the expenses Harnischfeger avoided.

Resolving these contentions would require a shot in the dark. How much benefit, in lower legal expenses, did Harnischfeger receive when Harbor assumed the defenses before it was required to? The answer could range from a few thousand dollars (if Harnischfeger would have settled quickly to get over the threshold) to several million dollars (Harbor's demand in this suit). Harbor could have avoided this problem by taking greater care when Harnischfeger tendered the defenses—not by refusing to step in, but by obtaining some agreement about how expenses would be apportioned in the event a court should conclude that the underlying limits in the policy excluded legal costs. Uncertainty is Harbor's creation. Harnischfeger hid nothing when proffering the case files. The printout showed that it had not yet paid $3 million to claimants. Wisconsin, we believe, would apply the equitable principles of the *Restatement* to leave the burden of uncertainty with Harbor. Harbor is entitled to restitution of the difference between $3 million and the amount Harnischfeger paid to claimants in each policy year, but Harbor must bear its own legal expenses.

On Harnischfeger's appeal, No. 90–2104, the judgment is affirmed. On Harbor's appeal, No. 90–2162, the judgment is affirmed to the extent it denies Harbor's claim for restitution of legal expenses and reversed to the extent it denies Harbor's claim for restitution of the indemnity it was not contractually obliged to provide. The case is remanded for computation of this sum.