**LINDSAY MANUFACTURING CO., Plaintiff,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, and Hartford Insurance Company of Illinois, Defendants and Counterclaimants.**

CV 90–0–610.

United States District Court,
D. Nebraska.

Dec. 13, 1995.

William J. Brennan, Jr., Gerald L. Friedrichsen, William J. Riley, Fitzgerald, Schorr Law Firm, Omaha, NE, William H. Grant, Grant, Rogers Law Firm, Columbus, NE, for Lindsay Manufacturing Company.

William M. Lamson, Jr., Lyman L. Larsen, Kennedy, Holland Law Firm, Omaha, NE, James R. Murray, Robert S. Soderstrom,

Tressler, Soderstrom Law Firm, Chicago, IL, for Hartford Accident & Indemnity Company, and Hartford Insurance Company.

## MEMORANDUM AND ORDER

SHANAHAN, District Judge.

Before the court are: (1) filing no. 388, the "Plaintiff's Motion for Partial Summary Judgment and Alternative Motion to Certify Questions to the Nebraska Supreme Court" filed by the plaintiff, Lindsay Manufacturing Co. ("Lindsay"); and (2) filing no. 391, the "Defendants' Supplemental Motion for Summary Judgment," filed by the defendants and counterclaimants, Hartford Accident and Indemnity Company and Hartford Insurance Company of Illinois (collectively "Hartford").

Lindsay operates a manufacturing plant in Lindsay, Nebraska which manufactures, among other items, irrigation equipment. During Lindsay's manufacturing process, steel parts of the irrigation equipment are galvanized (zinc coated). Prior to galvanization, the steel is cleaned or "pickled" by immersion in a bath of sulfuric acid which is referred to as "pickle liquor." When pickle liquor is no longer effective, it is called "spent pickle liquor" ("SPL"). SPL contains substances such as sulfuric acid, lead, chromium and zinc. From the commencement of its galvanizing operations in 1972 through the end of 1982, Lindsay disposed of SPL by pumping it into an open, unlined, earthen waste pit.

SPL is a hazardous waste. In 1980, the United States Environmental Protection Agency ("EPA") determined that Lindsay was a potential handler of hazardous waste and notified Lindsay accordingly. Lindsay then began to develop a plan for remediation and subsequently entered into stipulations with the Nebraska Department of Environmental Control ("NDEC") which was working in conjunction with EPA.

A "Stipulation and Agreement," dated January 5, 1989 by and between the NDEC and Lindsay, recites that a release of hazardous substances and pollutants at Lindsay's facility in Lindsay, Platte County, Nebraska, had resulted in contamination of the soil and groundwater. The "Stipulation and Agreement" states that Lindsay was cooperating with NDEC by conducting site assessment and remedial activities to address the cleanup of the contamination or pollution. More specifically, at § II, ¶ 5, the "Stipulation and Agreement" states:

> Lindsay and NDEC entered into a Stipulation on April 19, 1983 in which Lindsay agreed to assess the extent of contamination, propose a remedial action plan, submit a groundwater monitoring schedule, submit a closure plan for the acid disposal pit, obtain a National Pollutant Discharge Elimination System (NPDES) permit, and complete construction of a wastewater treatment facility. This Stipulation was subsequently amended on August 10, 1983 and March 7, 1984. Lindsay submitted to NDEC a closure plan for the disposal pit and remedial action plan for the cleanup of contamination which were approved by NDEC on September 1, 1983 with certain additions. The waste disposal pit was certified as closed pursuant to RCRA and 40 C.F.R. Part 265 on October 27, 1983. The March 7, 1984 Second Amended Stipulation requires Lindsay to continue monthly monitoring of the aquifer and long-term remedial action as necessary to restore the aquifer to background condition as determined by NDEC.

The "Stipulation and Agreement" acknowledges that hazardous substances, pollutants or contaminants, as defined or characterized in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), have been discharged by Lindsay at its Nebraska plant site. In the "Stipulation and Agreement," Lindsay agrees to perform remedial work in compliance with CERCLA, as amended by the Superfund Amendments and Reauthorization Act ("SARA"), as well as in compliance with the Nebraska Environmental Protection Act ("NEPA").

After Lindsay received notice from the EPA in May 1980 that it was a potential handler of hazardous waste, Lindsay employed Terry A. Bonham as an environmental consultant. In a "Report on Plant Environmental Program" dated November 18, 1980, Bonham advised that Lindsay's "galva-

nizing plant waste" constitutes a hazardous waste under the Resource Conservation and Recovery Act ("RCRA"). Additionally, Lindsay agrees that the waste pit was certified as closed in 1983 pursuant to RCRA.

Until October 12, 1988, Lindsay was a wholly-owned corporate subsidiary of DE-KALB Ag Research, Inc., now known as DEKALB Energy Company ("DEKALB"). Pursuant to stock offerings in 1988 and 1989, Lindsay became a separate, publicly-owned corporation. (See "Prospectus" dated October 12, 1988.)

This litigation concerns two standard policies of comprehensive general liability ("CGL") insurance which Hartford issued to DEKALB and which include Lindsay as a "named insured." Specifically, Hartford Accident & Indemnity Company issued a primary policy, no. 83 CLR P10722E, for the period from January 1, 1982 to January 1, 1983. Hartford Insurance Company of Illinois issued an umbrella liability policy, no. 83 HU 603857, for coverage in excess of the primary policy during the same period.

Notwithstanding that Lindsay began its investigation of the contamination sometime in 1980 and entered into stipulations with NDEC for remedial action early in 1983, it was not until October 1985 that Hartford received notice of the contamination, investigation, remedial action plan and cleanup activity. In a letter of October 4, 1985, Lindsay notified Hartford concerning the contamination and referred to the primary policy, "Policy No. 83 CLRP 10722E." In that letter, Lindsay also stated: "We are filing this claim under the policy noted above for this loss."

Although Hartford did make some payments to Lindsay regarding remedial activities involving the contamination, Hartford subsequently refused to make any additional payments. In response to Hartford's refusal, Lindsay filed its action in a state court, but Hartford removed that action to this court.

In its Petition filed in the state court, Lindsay alleges that NDEC and EPA have "asserted claims against Lindsay seeking to compel Lindsay to clean up the aquifer underlying and in the vicinity of Lindsay's plant." Lindsay seeks a recovery based on a separate agreement with Hartford "to reimburse [Lindsay] for all the expenses incurred by virtue of the claims made by [NDEC] and [EPA];" ("First Theory of Recovery"); estoppel of Hartford to deny coverage ("Second Theory of Recovery"); Hartford's breach of its policies issued to Lindsay ("Third Theory of Recovery"); and "Equitable Relief requiring [Hartford] to continue paying under the insurance contracts and agreement with [Lindsay]," that is, a "temporary and permanent injunction [requiring Hartford] to pay on a quarterly basis the expenses incurred by [Lindsay]" ("Fourth Theory of Recovery"). Hartford denied liability to Lindsay and counterclaimed, seeking to recover back the payments made regarding Lindsay's efforts to remedy the contamination.

## MOTIONS FOR SUMMARY JUDGMENT

### Lindsay's Motion.

In its motion for summary judgment, Lindsay requests the determinations that "(a) the laws of the State of Illinois govern the substantive issues in this litigation; (b) Hartford's counterclaim, whether based upon theories of fraud, misrepresentation or mutual mistake of fact, are barred; (c) Hartford waived any violation of the notice provisions of its policies as a basis to deny coverage; (d) Hartford's payments were not made under a reservation of rights; (e) Hartford did not issue a reservation of rights under its umbrella policy; and (f) Hartford agreed to pay the ongoing expenses for cleaning the aquifer subject only to an audit of the expenses." (Filing no. 388).

"By its motion for summary judgment, Lindsay seeks a summary judgment finding Hartford's counterclaim is barred as a matter of law. Lindsay also seeks a court order directing Hartford to indemnify Lindsay for the costs it has incurred and will incur to comply with the actions required by the EPA and the NDEC to clean the aquifer." (Lindsay's brief at 2; submitted February 10, 1995).

### Hartford's Motion.

In its motion for summary judgment, Hartford seeks judgment that there is no

coverage afforded Lindsay under Hartford's CGL policies involved in this action. Also, Hartford seeks judgment for restitution of the payments to Lindsay for reimbursement of cleanup costs regarding the waste pit at Lindsay's plant.

## SUMMARY JUDGMENT

With respect to each of the pending motions for summary judgment (filing nos. 388 and 391), the court must examine the record in the light most favorable to the nonmoving party. *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). However, summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 323–25, 325–27, 106 S.Ct. at 2553, 2554.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.*

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable ... or is not sufficiently probative ... summary judgment may be granted." *Id.* In addition, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law.... Instead, 'the dispute must be outcome determinative under prevailing law.'" *Get Away Club, Inc. v. Coleman,* 969 F.2d at 666 (citations omitted).

## CHOICE OF LAW

In the "Memorandum and Order" dated September 29, 1995 (filing no. 371), this court stated that the choice of substantive law applicable to this action will determine certain issues relative to the question of insurance coverage under Hartford's policies. Lindsay advocates a construction of the policies by reference to Illinois law, while Hartford argues in favor of applying Nebraska law to construe the policies.

In a diversity case such as this, a federal court applies rules of the forum state to determine the choice of law. *Gateway Western Railway Co. v. Morrison Metalweld Process Corp.,* 46 F.3d 860, 863 (8th Cir. 1995). In filing no. 371, the court noted that in *Powell v. American Charter Federal Savings & Loan Ass'n,* 245 Neb. 551, 514 N.W.2d 326, 331–332 (1994), the Supreme Court of the State of Nebraska adopted the approach set forth in section 188 of the Restatement (Second) of Conflict of Laws (the "Restatement") to determine the choice of law to be applied in contract actions in the absence of a contractual provision controlling choice of law.

Section 188 of the Restatement focuses on the state which has the most significant relationship to the transaction and the parties. Section 188(2) states that in determining the law applicable to an issue, a court must look at such factors as the place of contracting, the place of negotiation for the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. The Restatement directs that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." Moreover, the

Eighth Circuit emphasizes that "[w]hat matters is not a mechanical tally of these factors, but an analysis of their relative importance to the particular claim under consideration." *Gateway Western Railway Co. v. Morrison Metalweld Process Corp.*, 46 F.3d at 863.

Of the foregoing factors, the court finds that the location of the subject matter of the contract has the primary importance in this case. The Restatement further explains that when rights under a policy of casualty insurance, such as a liability policy, are in issue, the law of the state where the insured risk is located should be applied. Restatement § 193 and Comment a.

The court finds that Nebraska has the most significant interest in determining who will pay for the cleanup of a contaminated site within the state's borders. Thus, Nebraska is the state whose interests are most deeply affected by the interpretation of the insurance contracts at issue in this case. The court will not automatically presume that Nebraska's interests are best served by sidestepping local law in favor of the law of another state which might provide substantially greater insurance coverage for the subject risk. Matters such as the availability and cost of insurance to Nebraska citizens, the willingness of insurance companies to locate within Nebraska and the freedom of parties to define their own contracts are also interests of importance to Nebraskans.

The court agrees with Hartford that Nebraska has a more significant relationship with the transaction and the parties than does Illinois. Lindsay, a named insured, is located in Nebraska. The waste site is located in Nebraska. The hazardous waste was generated in Nebraska and has come to rest in Nebraska. An aquifer which is a source of water for Nebraska citizens has been contaminated. Lindsay furnished Hartford's policies to the NDEC as well as proof of Lindsay's requisite financial responsibility relative to the waste pit. Accordingly, the court finds that in light of §§ 6, 188 and 193 of the Restatement, the law of Nebraska applies to construe the insurance contract provisions pertaining to the risks located in Nebraska which are involved in this action.

## ENVIRONMENTAL CLEANUP COSTS

### Eighth Circuit

The Eighth Circuit, applying Missouri and Arkansas law, has construed language in the standard CGL policy which obligates the insurer to pay on behalf of the insured those sums which the insured shall become obligated to pay "as damages." As the Eighth Circuit stated in *Federated Rural Electric Insurance Corp. v. Arkansas Electric Cooperatives, Inc.*, 48 F.3d 294, 295 (8th Cir.1995), "[t]his circuit has held that clauses of this type do not obligate the insurer ... to pay cleanup costs under CERCLA or RCRA." (Citations omitted.)

Beginning in 1988 with its decision in *Continental Insurance Companies v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 842 F.2d 977, 985–987 (8th Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("*NEPACCO*") the Eighth Circuit has consistently held that the phrase "as damages" in the CGL policy's insuring clause does not include environmental cleanup costs. Accord *Aetna Casualty & Surety Co. v. General Dynamics Corp.*, 968 F.2d 707, 712–713 (8th Cir.1992); *Grisham v. Commercial Union Insurance Co.*, 951 F.2d 872, 875 (8th Cir.1991); *Parker Solvents Co. v. Royal Insurance Cos.*, 950 F.2d 571, 572 (8th Cir. 1991). See, e.g., *Aetna Casualty & Surety Co. v. General Dynamics Corp.*, 968 F.2d at 712:

> In NEPACCO we stated: We hold "that the plain meaning of the term 'damages' used in the CGL policies refers to legal damages and does not cover cleanup costs." ... We determined that "the term 'damages' is not ambiguous in the insurance context." ... The policy language in this case is the same as the language at issue in NEPACCO. Because NEPACCO's holding is not limited in application to a particular insurance contract, nor is the term "damages" ambiguous, extrinsic evidence may not be considered.

According to the Eighth Circuit's interpretation of the relevant policy language, the insuring clause does not make an unqualified promise to pay all sums which the insured shall become legally obligated to pay. Rath-

er, the addition of the modifying phrase "as damages" creates a limitation on coverage, restricting the kinds of "sums" which are indemnified. *NEPACCO*, 842 F.2d at 985–986. "As damages" means insurance coverage for legal damages which the insured becomes liable to pay, but does not mean coverage for equitable relief, such as the insured's costs of complying with injunctions or governmental orders to clean up environmental contamination. *Id.* at 986–987.

*Nebraska*

■ When addressing a legal issue of state law in a diversity action, a federal court is bound by the decisions of the state's highest court. If a state's highest court has yet to address a particular issue, a federal court must determine what conclusion the highest court would probably reach if the state court were to decide the issue. In that regard, a federal court may consider "relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data." *Farr v. Farm Bureau Insurance Co.*, 61 F.3d 677, 679 (8th Cir.1995), citing *B.B. v. Continental Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir.1993). Thus, a federal court must ascertain what the highest state court would declare to be the law of the state if a question were presented to the court. *Guillard v. Niagara Machine & Tool Works*, 488 F.2d 20, 24 (8th Cir.1973).

■ While the Supreme Court of the State of Nebraska has not addressed the issue whether an "as damages" clause in a CGL insurance policy covers response costs, Nebraska's Supreme Court does employ rules of construction which are similar to those applied by the court in *NEPACCO*. For example, the Nebraska Supreme Court stated in *Katskee v. Blue Cross/Blue Shield*, 245 Neb. 808, 515 N.W.2d 645, 649 (1994):

An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention

of the parties from the plain language of the policy.

When interpreting the plain meaning of the terms of an insurance policy, we have stated that the " ' "natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning" ' " . . . . We have further stated that " '[w]hile for the purposes of judicial decision dictionary definitions often are not controlling, they are at least persuasive that meanings which they do not embrace are not common.' "

(Citation omitted). See, also, *Union Ins. Co. v. Land and Sky, Inc.*, 247 Neb. 696, 529 N.W.2d 773, 776 (1995): "Whether a document is ambiguous is a question of law . . . . A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings."

In view of the decisions of the Eighth Circuit Court of Appeals in *NEPACCO*, *Federated Rural Electric* and *Grisham*, which are decisions involving language identical or substantially similar to the language in Hartford's policies in the present action, the court finds and concludes that (1) the term "damages," as used in Hartford's two CGL policies in this action, does not include liability for "response costs" and (2) the preceding interpretation, excluding response costs from "damages," comports with the distinction CERCLA makes between damages and response costs. See 42 U.S.C. § 9607(a)(4)(A) (a party shall be liable for "all costs of removal or remedial action incurred by the United States Government") and 42 U.S.C. § 9607(a)(4)(C) (a party shall be liable for "damages for injury to, destruction of, or loss of natural resources"). Also, in view of the similarity of the rules of construction used by courts in Nebraska, Missouri and Arkansas, this court concludes that, if presented with the issue of coverage relative to the "as damages" provision in the policies involved in this action, the Supreme Court of Nebraska would reach the same result which was reached by the majority of the Court of Appeals in *NEPACCO*.

In summary, and for the reasons expressed above, the court finds and concludes that the Hartford policies which are the subject of this action do not afford insurance coverage for Lindsay's costs to clean up the contamination of soil and ground water at its Nebraska plant.

*Pollution Exclusion*

Having determined that Lindsay's cleanup costs are not "damages" and, therefore, are not covered under Hartford's policies, the court does not reach the question of the pollution exclusion contained in each of the policies. The pollution exclusion[s] may be applicable only if the policies afforded coverage for Lindsay's cleanup of contaminants or pollutants. However, as stated, such costs are not "sums [which Lindsay is] obligated to pay as damages."

*Cause of the Contamination Is Moot*

Because the policies in this action do not insure Lindsay's environmental cleanup costs, the issues which have arisen concerning the precise cause of the contamination are moot. Whether contamination of the aquifer occurred as the result of a sudden spilling of SPL when Lindsay's monitoring wells were drilled or whether the contamination occurred by protracted seepage from the waste pit does not affect the disposition of this action. In either situation, that is, a sudden spilling or protracted seepage, cleanup costs are not "damages" within the meaning of the insuring clauses of Hartford's policies involved in this action.

*Notice and Cooperation Clauses Are Moot*

Hartford argues that Lindsay breached the conditions of both liability policies which require timely notice of claims or occurrences and cooperation with the insurer. However, Lindsay contends that Hartford has failed to show prejudice from any untimely notice of claims or occurrences or any alleged failure of cooperation. According to Lindsay, in the absence of prejudice or detriment to the insurer, breach of the notice or cooperation clause[s] of a liability policy does not constitute a basis for a denial of coverage.

Nebraska law is unclear whether a liability insurer may deny coverage on the basis of the insured's breach of notice or cooperation clauses unless the insurer shows actual prejudice from the defective notice or cooperation. It is clear that regarding automobile insurance, an insurer may not assert a breach of the notice or cooperation clauses as a policy defense in the absence of a showing of prejudice to the insurer. See *Horace Mann Companies v. Pinaire*, 248 Neb. 640, 538 N.W.2d 168, 174 (1995); *Iowa Mutual Insurance Company v. Meckna*, 180 Neb. 516, 144 N.W.2d 73, 79–80 (1966); *MFA Mutual Insurance Co. v. Sailors*, 180 Neb. 201, 141 N.W.2d 846, 847–849 (1966). But see *Trausch v. Knecht*, 184 Neb. 134, 165 N.W.2d 738, 741, *vacated on other grounds*, 184 Neb. 511, 169 N.W.2d 269 (1969): "[W]here provisions relating to notice of accident and forwarding of a summons or other process are made conditions precedent to recovery, the failure to act with reasonable timeliness will release the insurer from the contractual obligation, although no prejudice may have resulted." However, because Hartford's policies do not afford coverage for Lindsay's cleanup costs, the court will not decide whether summary judgment for Hartford is warranted on the alternative basis of policy defenses relative to notice and cooperation by an insured.

*Certification*

Filing no. 388, the "Plaintiff's Motion for Partial Summary Judgment and Alternative Motion to Certify Questions to the Nebraska Supreme Court" filed by Lindsay requests that this court certify to the Nebraska Supreme Court questions concerning the interpretation of CGL policies and the pollution exclusion. Mindful that Neb.Rev.Stat. § 24–219 (Reissue 1989) also enables the Eighth Circuit to certify questions to the Nebraska Supreme Court, this court declines to certify any question concerning insurance coverage or policy defenses. Consequently, that part of filing no. 388 which requests such certification to the Supreme Court of the State of Nebraska shall be, and hereby is, denied.

**ESTOPPEL**

Lindsay contends that even if Hartford's policies do not impose a contractual duty to indemnify Lindsay for the cleanup costs,

Hartford must, nevertheless, provide coverage to Lindsay under the policies. Lindsay advances three reasons.

■ First, Lindsay alleges that Hartford entered into an agreement to pay for the cleanup costs. However, the court finds and concludes that the record is devoid of evidence of the essential elements of contract, namely, offer, acceptance and consideration, concerning the alleged contract. The court agrees with Hartford that the correspondence between Hartford and Lindsay, attempting to adjust Lindsay's claim for cleanup costs through 1986, did not, as a matter of law, create a new express or implied contract to expand insurance coverage beyond the insurance policies. See, e.g., *Hodges Food Stores, Inc. v. Gulf Insurance Co.*, 441 S.W.2d 309 (Tex.Civ.App.1969) (no consideration supported an insurance adjuster's promise to pay the policy limits, when the promise was founded upon the adjuster's erroneous belief, shared by the insured, that the insurance contract afforded coverage).

■ Second, Lindsay argues that Hartford did not refer specifically to the excess policy in Hartford's reservation of rights letters and did not issue a separate reservation of rights letter concerning the excess policy. Therefore, Lindsay contends that Hartford failed to preserve policy defenses pertaining to the excess policy. Hartford maintains that its practice is to issue one reservation of rights letter in reference to the primary policy when Hartford is the insurer under both a primary and an excess policy. According to Hartford, the reason for that practice is that the excess policy functions merely as a continuation of the coverage afforded under the primary policy. As explained by Max Cram, one of Hartford's representatives assigned to Lindsay's claim:

> I would probably write a single letter, simply because you normally write underlying and excess, or an umbrella, with the same company, and you can't have an excess unless you've reached a primary.

(May 25, 1993 Deposition of Max Cram at 248.) Lindsay has cited no authority, and the court has found none, that this "one letter" practice operates as a waiver of defenses under the excess policy.

■ Third, Lindsay contends that Hartford should be estopped from denying coverage under the policies. Estoppel may prevent an insurer from asserting a defense to coverage which is otherwise provided under an insurance policy. Thus, a forfeiture of otherwise existing coverage may be prevented by properly invoked estoppel. However, estoppel generally cannot be used to create coverage where coverage would not otherwise exist.

"[I]n contrast to the situation where a forfeiture of coverage is involved, waiver and estoppel usually cannot operate to extend coverage where none exists under the contract." *Looney v. Allstate Insurance Co.*, 392 F.2d 401, 408 (8th Cir.1968) (applying Arkansas law). "[E]stoppel may not be used 'to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom.'" *City of Carter Lake v. Aetna Casualty & Surety Co.*, 604 F.2d 1052, 1059 (8th Cir.1979) (applying Iowa law) (citations omitted).

The reason for the rule that estoppel cannot operate to furnish coverage for risks not otherwise insured under the policy is that "[i]nsurance contracts cannot be created by estoppel." 16B Appleman, Insurance Law & Practice § 9090 (1981). The doctrine of estoppel "cannot be invoked by an insured to create a primary liability of the insurer for which all elements of a binding contract are necessary." *Id.* See, e.g., *Braun v. Annesley*, 936 F.2d 1105, 1109 (10th Cir.1991): "The doctrine of estoppel, however, cannot be invoked to broaden the coverage of an insurance policy to bring within its protection risks that are not included under the terms of the policy.... The rationale for this rule is that estoppel cannot be used to create a contract."

Some jurisdictions recognize an exception to the general principle that estoppel cannot create coverage under an insurance policy that does not otherwise provide coverage. See, for example, *Looney v. Allstate Insurance Co.*, 392 F.2d at 408:

> Some states more broadly apply the estoppel principle and use it to extend coverage in a situation where the insurer, without

reservation of rights, has assumed vital control of a case. . . . But even that result rests on prejudice or waiver. And other cases point out that this rationale does not apply where the insurer has withdrawn at a time and under circumstances where the insured is left an adequate opportunity to defend.

■ Nebraska follows both the general rule and the exception set out above. See *First United Bank of Bellevue v. First American Title Insurance Co.*, 242 Neb. 640, 496 N.W.2d 474, 480 (1993): "As a general rule, the doctrine of estoppel may not be used to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom. . . . The exception to the general estoppel rule applies when an insured is able to show (1) that the insurer had sufficient knowledge of facts or circumstances indicating non-coverage, (2) that the insurer assumed or continued defense of the insured without obtaining an effective reservation of rights agreement, and (3) that the insured suffered some type of harm or prejudice."

■ In this case, Lindsay did not send notice to Hartford as required by the policies until several years after Lindsay, through a series of stipulations with NDEC, had agreed to clean up the contamination. Nevertheless, Lindsay claims that it will suffer unfair prejudice in two respects unless Hartford is estopped from denying coverage under the policies.

First, after Hartford initially advanced payments to Lindsay on the belief that the policies afforded coverage, DEKALB caused certain statements to be placed in the prospectus for each of the two public offerings of Lindsay's capital stock. Those statements represented, in essence, that the ongoing out-of-pocket costs of Lindsay's cleanup of the aquifer were being reimbursed by Lindsay's insurer. According to Lindsay, Hartford failed to inform Lindsay or DEKALB that Hartford might "change its mind." However, the court fails to see how Lindsay suffered prejudice from the representations in either prospectus. Perhaps DEKALB might have suffered some harm, or Lindsay's prospective shareholders might complain about the purported misinformation. However, what prejudice there may have been to Lindsay itself, as a corporate entity distinct from DEKALB and Lindsay's shareholders, is not indicated in the record for this action.

■ Second, Lindsay asserts that Hartford took control of a subrogation action against the firm responsible for well-drilling incidents which may have contributed to contamination of the aquifer. Hartford rejected a settlement offer of approximately $300,000 in the subrogation action because Hartford had by that time reimbursed approximately $2.8 million of the cleanup expenses. Lindsay asserts the principle that a liability insurer which provides an unconditional defense of an action against its insured waives the terms of the policy and is estopped to assert policy defenses. Lindsay equates Hartford's control of the subrogation action with an insurer's defense of an action against its insured. However, the court does not consider Hartford's control of the subrogation action equivalent to assuming the defense of Lindsay, its insured, and then denying coverage when such defense proves unsuccessful. Thus, the record in this action contains no genuine issue of material fact concerning an insured's "detrimental good faith reliance" which is required to support estoppel of the insurer. See generally *Design Data Corp. v. Maryland Casualty Co.*, 243 Neb. 945, 503 N.W.2d 552, 560 (1993). Consequently, Lindsay has failed to present a basis for its claim that Hartford should be estopped to deny coverage under the policies.

## COUNTERCLAIM

■ In its counterclaim, Hartford seeks restitution and recovery of $2,376,741 in payments made after October 12, 1998 under the CGL policies. There is no dispute that Hartford paid Lindsay $2,376,741 as reimbursement for cleanup costs. Hartford claims that those payments were induced by Lindsay's fraudulent or negligent misrepresentations concerning the cause of the contamination of the aquifer. In the alternative, Lindsay claims restitution on account of a mistake of fact, namely, "a mistake of fact that the

terms of an insurance contract require such payment." (Hartford's brief at 30).

As previously expressed in this "Memorandum and Order," the court has already determined that the cause of the contamination is irrelevant to the question of coverage under Hartford's policies. The policies do not afford insurance coverage for equitable relief, such as the insured's costs of complying with injunctions or governmental orders to clean up environmental contamination. Therefore, the remaining issue is whether Hartford, after erroneously believing that the policies afford coverage for cleanup costs, may now recover the payments advanced under that mistaken belief.

Some decisions distinguish between mistake of fact and mistake of law, permitting restitution for the former but not the latter. However, as the court pointed out in *Harnischfeger Corp. v. Harbor Insurance Co.*, 927 F.2d 974, 977 (7th Cir.), *cert. denied*, 502 U.S. 864, 112 S.Ct. 189, 116 L.Ed.2d 150 (1991): "Most disputes involve questions of both fact and law.... Such [issues] cannot be sorted neatly into bins marked 'fact' and 'law'." Accord *Hartford Accident & Indemnity Co. v. Chicago Housing Authority*, 12 F.3d 92, 97 (7th Cir.1993): "[T]here is no bright line test between mistakes of law and mistakes of fact."

The difficulty of distinguishing between a mistake of fact and a mistake of law is exemplified by *Chalupa v. Hartford Fire Insurance Co.*, 217 Neb. 662, 350 N.W.2d 541 (1984). In *Chalupa*, the insurer made payments to its insured under the mistaken belief that the dwelling which suffered water damage was covered for that peril. A reading of the policy together with the application for insurance revealed which buildings were covered for which hazards. The Nebraska Supreme Court construed the insurer's misconception regarding the extent of coverage for the damaged building as a mistake of fact. *Id.* 350 N.W.2d at 544–545. Consequently, the insurer could recover the erroneous payments so long as the payee had not changed position so that it would be inequitable to require repayment. *Id.*

See also *Glover v. Metropolitan Life Insurance Co.*, 664 F.2d 1101 (8th Cir.1981) and *Glover v. Metropolitan Life Insurance Co.*, 698 F.2d 947 (8th Cir.1983). In the *Glover* decisions, an insurer erroneously paid life insurance to the second spouse of the decedent rather than to the former spouse whose rights derived from a divorce decree and property settlement. The Eighth Circuit refused to deny restitution to the insurer merely because paying the wrong beneficiary is a mistake of law. Instead, the two crucial issues were (1) whether the recipient of the erroneously paid funds had received a windfall and would be unjustly enriched and (2) whether the recipient had detrimentally changed position in reliance on the receipt of payments. Finding unjust enrichment and no detrimental reliance, the Eighth Circuit permitted the insurer to recover the amount paid by mistake. See *Glover*, 698 F.2d at 948–949.

The court finds that Lindsay has been unjustly enriched by the receipt of payment for reimbursement of cleanup costs to which it was not entitled under Hartford's policies. Furthermore, the court finds no evidence whatsoever in the record that Lindsay changed its position to its detriment in reliance on its receipt of the payments. Moreover, this is not a situation in which the recipient of the erroneously paid insurance proceeds is an innocent loss payee or good faith provider of products or services to the insured, as was the situation in *Federated Mutual Insurance Co. v. Good Samaritan Hospital*, 191 Neb. 212, 214 N.W.2d 493 (1974).

In addition, as the Seventh Circuit pointed out in *Harnischfeger*, 927 F.2d at 977, as a matter of policy, it would be unwise to discourage insurers from making payments, even if the payments were made in error, by refusing to permit later adjustments. In *Harnischfeger*, the court stated:

Why should Wisconsin try to pick through cases of mistaken payments, allowing insurers to recoup some but not others? .... Why? If [the insurer] cannot recover in situations like this one, then it will resolve all close cases against coverage.... [I]nsurers will balk in the future, compelling their insureds to pay up front and bring suit to recover.... Does Wisconsin

want to induce insurers to play coy when their clients ask for assistance?

*Id.*

The court does not believe that Nebraska law requires penalizing Hartford for its good faith, albeit erroneous, payments to Lindsay as the result of Hartford's mistaken belief that the policies required the payments. Lindsay has shown no detrimental change of position in reliance on Hartford's payments; no other reason why it should retain a windfall of several million mistakenly-paid dollars; and no genuine issue of material fact. Consequently, the court finds and concludes that Hartford should prevail on its counterclaim based on restitution and recovery back from Lindsay concerning the amount erroneously paid as reimbursement for cleanup costs.

## SCOPE OF JUDGMENT

■ Because the disposition of filing nos. 388 and 391 leaves no genuine issues of material fact as to the substantive issues in this case, the court will enter summary judgment in favor of Hartford and against Lindsay on Lindsay's Petition and in favor of Hartford on its Third Amended Counterclaim. To the extent, if any, that the motions filed by Hartford do not specifically request all the relief granted in the summary judgment, see *Interco Incorporated v. National Surety Corp.*, 900 F.2d 1264, 1269 (8th Cir. 1990):

> A federal district court may grant summary judgment, pursuant to Fed.R.Civ.P. 56, sua sponte, provided that the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted.... The granting of summary judgment sua sponte is consistent with the expeditious disposition of cases, a primary objective of Rule 56.

Accord *Hubbard v. Parker*, 994 F.2d 529, 530–531 (8th Cir.1993); *McNees v. Mountain Home*, 993 F.2d 1359, 1361–1362 (8th Cir. 1993); *Marshall v. Local Union No. 6*, 960 F.2d 1360, 1368 (8th Cir.1992).

THEREFORE, IT IS ORDERED:

(1) That filing no. 388, the "Plaintiff's Motion for Partial Summary Judgment and Alternative Motion to Certify Questions to the Nebraska Supreme Court" filed by the plaintiff, Lindsay Manufacturing Co. ("Lindsay") is denied;

(2) That filing no. 391, the "Defendants' Supplemental Motion for Summary Judgment," which incorporates the defendants' previous motion for summary judgment (filing no. 313), filed by the defendants and counterclaimants, Hartford Accident and Indemnity Company and Hartford Insurance Company of Illinois (collectively "Hartford"), is granted in part and denied in part, namely:

> (a) summary judgment is granted as to the issues of choice of law and policy coverage; specifically, that Nebraska law applies to the interpretation or construction of Hartford's policies involved in this action, and under Nebraska law, Hartford's policies do not afford coverage for Lindsay's environmental cleanup costs;
>
> (b) summary judgment is granted to Hartford and against Lindsay on Hartford's third amended counterclaim; specifically, Hartford will be granted judgment against Lindsay for $2,376,741 as restitution for Hartford's erroneous payment of Lindsay's cleanup costs;
>
> (c) summary judgment is denied on all other issues discussed in this "Memorandum and Order" relative to Lindsay's alleged breach of its obligations to provide timely notice and cooperation to Hartford under the policies in this action;

(3) That in accordance with this "Memorandum and Order," judgment will be entered contemporaneously in favor of the defendants, Hartford Accident and Indemnity Company and Hartford Insurance Company of Illinois, and against the plaintiff, Lindsay Manufacturing Co., on the plaintiff's Petition so that the plaintiff's Petition and action will be dismissed; and

(4) That in accordance with this "Memorandum and Order," judgment will be entered contemporaneously in favor of the defendants, Hartford Accident and Indemnity Company and Hartford Insurance Company of Illinois, and against the plaintiff, Lindsay

Manufacturing Co., on the defendants' Third Amended Counterclaim.